RECORD NO. 14-1245

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

RG STEEL SPARROWS POINT, LLC,
f/k/a Severstal Sparrows Point, LLC,

*Plaintiff-Appellee,*

v.

## KINDER MORGAN BULK TERMINALS, INC.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

### PAGE-PROOF OPENING BRIEF OF APPELLANT

Thomas M. Wolf (Va. Bar 18234)
LeClairRyan, a Professional Corporation
951 East Byrd Street, 8th Floor
Richmond, Virginia 23219
(804) 916-7143 Telephone
(804) 916-7243 Facsimile
thomas.wolf@leclairryan.com

Joseph M. Rainsbury (Va. Bar 45782)
LeClairRyan, a Professional Corporation
1800 Wells Fargo Tower, Suite 1200
Roanoke, Virginia 24006
(540) 510-3055 Telephone
(540) 510-3050 Facsimile
joseph.rainsbury@leclairryan.com

*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1245__    Caption: __RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Kinder Morgan Bulk Terminals, Inc.__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

      See Attachment A.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
      If yes, identify all such owners:

      See Attachment A.

10/28/2013 SCC    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? ☑YES ☐NO
    If yes, identify entity and nature of interest:

    See Attachment A

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

    Although this appeal does not itself arise out of a bankruptcy proceeding, Appellee is the debtor and Appellant is a creditor in a bankruptcy now pending in the U.S. Bankruptcy Court for the District of Delaware. See Attachment B for more information about that case.

Signature: /s/ Joseph M. Rainsbury          Date:    May 22, 2014

Counsel for: Kinder Morgan Bulk Terminals, Inc.

## CERTIFICATE OF SERVICE
****************************

I certify that on    May 22, 2014    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Joseph M. Rainsbury                          May 22, 2014
        (signature)                                  (date)

- 2 -

Attachment A—Explanation of Appellant's Ownership

Appellant <u>Kinder Morgan Bulk Terminals, Inc</u>. is a wholly owned subsidiary of <u>Kinder Morgan Operating L.P. "C"</u>)("KMOLP C"), a Delaware limited partnership.

All of KMOLP C's limited partnership interests are owned by <u>Kinder Morgan Energy Partners, L.P.</u> ("KMP"), a master limited partnership organized under Delaware law whose partnership units are traded on the New York Stock Exchange under the symbol "<u>KMP</u>".

The general partner of KMP is <u>Kinder Morgan G.P., Inc.</u> ("KMGP"), a Delaware corporation which is an indirect, wholly owned subsidiary of <u>Kinder Morgan, Inc.</u>, a Delaware corporation whose shares are traded on the New York Stock Exchange under the symbol "<u>KMI</u>".

KMGP has delegated to <u>Kinder Morgan Management, LLC</u> ("KMR") all of its power and authority to manage and control the business and affairs of KMP to the fullest extent permitted under Delaware law and KMP's partnership agreement.  The non-voting shares of KMR are traded on the New York Stock Exchange under the symbol "<u>KMR</u>".

Attachment B—Bankruptcy Information

The appellee, RG Steel Sparrows Point, LLC, is a party to a bankruptcy proceeding, *In Re WP Steel Venture LLC*, Case No. 12-11661-KJC, in the U.S. Bankruptcy Court for the District of Delaware. Appellant is a creditor in such bankruptcy proceeding.

RG Steel Sparrows Point, LLC is a debtor in possession, and remains in control of its property and operation of its business. No chapter 11 trustee or examiner has been appointed in its bankruptcy case. Mark Kinney serves as the attorney from the Office of the United States Trustee with respect to this case.

The members of the Committee of Unsecured Creditors are: Cliff's Natural Resources, Inc., Metal Services, LLC, dba Phoenix Services LLC, Siemens Industry Inc., United Steelworkers, Pension Benefit Guaranty Corporation, Mingo Junction Energy Center, LLC, and Balli Steel PLC and Balli Group PLC.

# CONTENTS

Table of Authorities...................................................................iii

Preliminary Statement............................................................1

Jurisdictional Statement ........................................................3

Statement of the Issues Presented for Review .....................5

Statement of the Case ............................................................6

    The Bridge Crane.................................................................6

    The 1992 Lease....................................................................7

    The Bankruptcy Sale and Termination of the
        1992 Lease ...................................................................9

    The Interim Agreement ....................................................10

    The Purchase Orders ........................................................13

    Changes in Ownership of Sparrows Point From
        2005-08........................................................................14

    The February 21, 2008 Purchase Order ..............................15

    The Collapse of the Bridge Crane .....................................18

    The Bench Trial and the District Court's
        Findings of Fact and Conclusions of Law .....................19

Summary of the Argument....................................................26

Argument................................................................................28

    I.    The District Court erroneously allowed an
          implied contract to supersede the parties'
          express contract on the same subject
          matter................................................................................28

        A.    Standard of Review ......................................................28

        B.    The February 21, 2008 Purchase Order
             governed the parties' relationship with
             respect to the unloading of coke. ...............................29

        C.    The District Court erroneously disregarded
             the Purchase Order.......................................................35

D.    The District Court's errors regarding the Purchase Order undermine its liability and damages rulings. ........................................... 44

**II.    The evidence was insufficient to support the District Court's awards for demurrage and changes in commercial terms. ...................................... 49**

A.    Standard of Review ....................................... 50

B.    Cohen should not have been allowed to opine on damages because he lacked relevant experience. ................................... 50

C.    Cohen failed to consider other factors that may have affected demurrage....................................54

D.    In analyzing changes to commercial terms, Cohen relied on inadequate evidence and improperly assumed that coke price was a direct function of laytime.............................. 62

**Conclusion and Request for Oral Argument**................................. 68

**Certificate of Compliance With Rule 32(A)(7)**.............................. 70

**Certificate of Service** ....................................................... 71

# TABLE OF AUTHORITIES

**Cases**

*ABT Assocs., Inc. v. JHPIEGO Corp.*, 9 Fed. Appx. 172 (4th Cir. 2001)...................................................................34

*Audio Visual Associates, Inc. v. Sharp Electronics Corp.*, 210 F.3d 254 (4th Cir. 2000)...................................................32, 33

*Brock Bridge Ltd. P'ship, Inc. v. Dev. Facilitators, Inc.*, 689 A.2d 622 (Md. Ct. Spec. App. 1997)...........................................67

*Bullock Constr. v. Fed. Express Corp.*, 846 F.2d 69 (4th Cir. 1988).........................................................................47

*CDC-LCGH, LLC v. Mayor*, 313 F. App'x 637 (4th Cir. 2009)......38

*Consolidated Rail Corp. v. Lansdale Warehouse Co., Inc.*, Civ. No. 89-8085, 1990 WL 63743 (E.D. Pa. May 8, 1990)........58

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194 (4th Cir. 2001).....................................................................50, 57

*County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600 (Md. 2000) ...................................passim

*CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114 (4th Cir. 2004).................................................................34

*Dehn v. Edgecombe*, 834 A.2d 146 (Md. Ct. Spec. App. 2003).......56

*F.C. Wheat Mar. Corp. v. United States*, 663 F.3d 714 (4th Cir. 2011)...........................................................................6

*F.T.C. v. Ross*, 743 F.3d 886 (4th Cir. 2014)............................28, 50

*First Nat'l Bank of Md. v. Burton, Parsons & Co.*, 470 A.2d 822 (Md. Ct. Spec. App. 1984) ......................................................38

*Hardin v. Ski Venture, Inc.*, 50 F.3d 1291 (4th Cir. 1995) ............53

iii

*havePOWER, LLC v. General Elec. Co.*, 183 F. Supp. 2d 779 (D. Md. 2002)...............................................................40

*Helton v. AT & T, Inc.*, 709 F.3d 343 (4th Cir. 2013) ...................28

*Henson v. Liggett Group, Inc.*, 61 F.3d 270 (4th Cir. 1995)...........57

*Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915 (Md. Ct. Spec. App. 2007)........................................................57

*Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274 (4th Cir. 1987)...............................................................48

*Levy v. Lexington County*, 589 F.3d 708 (4th Cir. 2009) ..............64

*Louers v. Lacy*, 2013 WL 6257572 (D. Md. Dec. 3, 2013) .............38

*Marcatante v. City of Chicago*, 657 F.3d 433 (7th Cir. 2011) ........42

*Matter of Penn Cent. Transp. Co.*, 831 F.2d 1221 (3d Cir. 1987).....................................................................42

*Myers v. Kayhoe*, 892 A.2d 520 (Md. 2006) ...................................41

*Oglesby v. Gen. Motors Corp.*, 190 F.3d 244 (4th Cir. 1999) ...53, 57

*Orteck Int'l, Inc. v. TransPacific Tire & Wheel, Inc.*, 457 Fed. Appx. 256 (4th Cir. 2011)...........................................32, 33

*Pepsi-Cola Bottling Co. of Pittsburg, Inc.*, 431 F.3d 1241 (10th Cir. 2005) ........................................................42

*Porter v. General Boiler Casing Co., Inc.*, 396 A.2d 1090 (Md. 1979).....................................................................33

*Potomac Constructors, LLC v. EFCO Corp.*, 530 F. Supp. 2d 731 (D. Md. 2008)......................................................47

*Radio Today, Inc. v. Westwood One, Inc.*, 684 F. Supp. 68 (S.D.N.Y. 1988) ........................................................40

*Rick's Mushroom Service, Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008) ................................................42

iv

*Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043 (4th Cir. 1989) ........................................................................... 47

*Rockwood Manufacturing Corp. v. AMP, Inc.*, 806 F.2d 142 (7th Cir. 1986) ............................................................ 42

*Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) ........................................................................ 42

*Schism v. U.S.*, 316 F.3d 1259 (Fed. Cir. 2002) ........................... 42

*Schrier v. Beltway Alarm Co.*, 533 A.2d 1316 (Md. Ct. Spec. App. 1987) ........................................................................ 48

*Soft Stuff Distribs. v. Ryder Truck Rental, Inc.*, 2012 WL 3111679 (D. Md. July 30, 2012) .................................. 40

*Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769 (4th Cir. 2013) ................................................................................ 34

*Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791 (4th Cir. 1989) ......................................................................... 53

*Thomas v. Capital Medical Management Assocs., LLC*, 985 A.2d 51 (Md. Ct. Spec. App. 2009) .............................. 33

*Townsend Properties v. Z.N., Inc.*, Civ. No. 93-3918, 1994 WL 750537 (D. Md. Nov. 15, 1994) ............................. 33, 34

*Transpacific Tire & Wheel, Inc. v. Orteck Int'l, Inc.*, Civ. No. 2006-187, 2010 WL 1375292 (D. Md. Mar. 30, 2010) ................. 32

*USEMCO, Inc. v. Marbro Co.*, 483 A.2d 88 (Md. Ct. Spec. App. 1984) ........................................................................ 32

*Vaughan v. MetraHealth Cos.*, 145 F.3d 197 (4th Cir. 1998) ........ 65

*Watts v. Columbia Artists Mgt., Inc.*, 591 N.Y.S.2d 234 (N.Y. App. Div. 1992) .................................................... 42

*White Constr. Co., Inc. v. Martin Marietta Materials*, 633 F. Supp. 2d 1302 (M.D. Fla. 2000) .................................. 40

*Wolf v. Ford*, 644 A.2d 522 (Md. 1994) .................................... 47, 48

**Statutes**

11 U.S.C. § 365(h)(1)(A)(i) ............................................... 29

28 U.S.C. § 1291 .......................................................... 3

28 U.S.C. § 1332(a)(1) .................................................... 3

**Other Authorities**

1 Williston on Contracts § 1:5 ........................................... 41

11 Williston on Contracts § 32:13 ........................................ 13

Black's Law Dictionary 463 (8th Ed. 2004) ................................ 51

Black's Law Dictionary 906 (8th Ed. 2004) ................................ 62

**Rules**

Fed. R. Civ. P. 52(a)(6) .................................................. 28

Fed. R. Evid. 702(a) ...................................................... 53

## PRELIMINARY STATEMENT

This is an appeal from a bench trial in a property-damage case involving the collapse of a large cargo-handling crane.  The case involves both tort and contract claims.  In its Findings of Fact and Conclusions of Law, the District Court committed two independent legal errors that led it to award Plaintiff millions of dollars in excessive damages.

**First**, the District Court erroneously allowed an implied contract to trump an express written contract.  Plaintiff's predecessor-in-interest owned the crane and the steel mill that it serviced.  Defendant operated the crane.  Plaintiff's Amended Complaint asserts that: (1) Defendant's negligence caused the collapse, and (2) Defendant's actions breached the parties' contract.  At the time of the accident, Defendant was using the crane to unload coke from a cargo vessel pursuant to a written February 2008 purchase order.  That purchase order—which became a binding contract when Defendant began performing under it—incorporated detailed terms and conditions that, among other things, excluded indirect and consequential damages.  Rather than apply those terms, however, the District Court held that the parties were operating under

a different agreement: a purported implied-in-fact contract based on the terms of a long-expired lease. And the District Court further held that Defendant breached this implied agreement. Thus, it awarded $6.6 million in consequential damages, which would *not* have been allowed under the purchase order's terms.

That was error. An express written agreement supersedes a purported implied-in-fact contract encompassing the same subject matter. The February 2008 purchase order was an express contract that covered the same subject matter (unloading coke from cargo vessels using Plaintiff's crane) as the purported implied-in-fact contract. Thus, the District Court should have rejected Plaintiff's contract claim and should *not* have awarded Plaintiff $6.6 in consequential damages on either the tort or contract claim.

**Second**, the District Court erred in relying on Plaintiff's expert, Jeffrey Cohen, in awarding nearly $4 million in damages for "demurrage" and changes in commercial terms that supposedly resulted from post-accident delays in unloading coke shipments. Cohen had no experience in the field—before his work in this case, he had never conducted a demurrage analysis and was unfamiliar with shipping-

2

contract terms.  His analysis of both classes of damages failed to consider alternate causes for the alleged damages.  The District Court erred in accepting Cohen's "expert" testimony regarding the quantum of damages for these two claims.  Furthermore, Cohen's testimony and methodology were legally insufficient to satisfy Plaintiff's burden to establish damages to a reasonable certainty—among other things, Cohen ignored alternate potential causes for the alleged damages.

In light of these legal errors, this Court should (1) reverse the District Court's contract ruling, and (2) bar consequential damages altogether or, at the very least, bar damages for the contested demurrage amounts and for changes to commercial terms.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 and the parties are citizens of different States.

This Court has subject-matter jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final order of the District Court.

The District Court entered its original final order on March 6, 2014.  Appellant filed a Notice of Appeal on March 13, 2014.  On March

24, 2014, Appellee filed a Rule 60(a)/59(e) motion. The District Court granted this motion on May 6, 2014, disposing of all remaining claims and issues in the case. Appellant filed an Amended Notice of Appeal on May 22, 2014, referencing the May 6, 2014 Order.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.   Whether Kinder Morgan's performance of the February 21, 2008 Purchase Order created an express contract between the parties.

2.   Whether such an express contract—which called for Kinder Morgan to unload coke using the Bridge Crane—superseded any purported implied-in-fact contract concerning the same subject matter.

3.   Whether the District Court erred in awarding consequential damages where such damages were expressly barred by the Terms and Conditions of the February 21, 2008 Purchase Order.

4.   Whether the District Court abused its discretion in allowing Plaintiff's economics expert, Jeffrey Cohen—who had no experience in analyzing maritime contracts—to offer expert opinions estimating the quantum of damages from "demurrage" and changes in contractual "laytime."

4.   Whether the District Court erred in basing its demurrage-damages award on Cohen's testimony, where Cohen had never made such a computation before, failed to consider other potential causes of increased demurrage, and did not use a sound methodology.

5.   Whether the District Court erred in basing its changes-in-commercial-terms damages award on Cohen's testimony, where Cohen had no experience with maritime contracts, reviewed only two contracts to make his estimate, and improperly assumed that coke prices were a direct function of unloading rates.

## STATEMENT OF THE CASE[1]

### *The Bridge Crane*

This case results from the collapse of a large cargo-handling crane ("Bridge Crane") during a storm that struck the Baltimore area on June 4, 2008. The Bridge Crane was located at Sparrows Point, a fully integrated steel mill on the Chesapeake Bay. (Dist. Ct. Finds. of Fact and Concls. of Law, D.E. #170 ("Op."), at 4.) Sparrows Point has a deep-water port, which allowed it to receive ocean-going vessels carrying ore, coal, coke, and other steel-making raw ingredients. (Op. at 4; Final Pretrial Order, D.E. #133 ("PTO") at 21.) The Bridge Crane, built in the mid-1950s, serviced Sparrows Point's "A Yard." (Op. at 4.) It was used to offload bulk materials, including coke,[2] from vessels and barges docked adjacent to the A Yard. (Op. at 4, PTO at 22.)

---

[1] As this is an appeal from a bench trial, the facts are recited in the light most favorable to the facts as found by the District Court. *F.C. Wheat Mar. Corp. v. United States*, 663 F.3d 714, 723 (4th Cir. 2011). Accordingly, most of the facts stated in this section are drawn from the District Court's findings or the parties' stipulations.

[2] Coke is a lightweight, brittle, substance made from coal and used as a fuel and oxidizing agent in the steel-making process.

The Bridge Crane was a "gantry crane" comprising two A-frame towers, connected by a bridge, and running on two sets of rails along the dock. (Op. at 4; PTO 22; PX 223, 224.) It was a large, steel structure, approximately 600 feet long and 160 feet tall. (Op. at 4; PTO at 22.) The rails along which it ran traversed 1,100 feet of dock and yard. (Op. at 4; PTO at 22.) The Bridge Crane normally required two operators. (Op. at 5.)

At the time of the accident, the Bridge Crane was equipped with three types of restraints to protect against wind-induced movement: brakes, manual rail clamps ("chocks"), and hurricane tie-downs. (Op. at 5, 12; PTO at 22.) At one point the Bridge Crane had automatic rail clamps—which could be deployed in high winds—but these had been removed in the mid-1990s. (Op. at 5; PTO at 22.)[3]

*The 1992 Lease*

The contractual history of the parties, and their predecessors in interest, is central to the issues in this appeal. Bethlehem Steel

---

[3] In this page-proof opening brief, Appellant will use Roman numerals to designate trial dates, with "I" being 11/12/13, "II" being 11/13/13, "III" being 11/14/13, "IV" being 11/19/13, "V" being 11/20/13, "VI" being 11/21/13, "VII" being 12/2/13, and "VIII" being 1/30/14.

Corporation ("Bethlehem") formerly owned Sparrows Point and the

Bridge Crane. (Op. at 5; PTO at 22.) In 1992, Bethlehem entered into a

Second Amended and Restated Lease and Marine Terminal Services

Agreement (the "1992 Lease" or "Lease") with Kinder Morgan's

predecessor-in-interest, Chesapeake Bulk Stevedores, Inc.

("Chesapeake"). (Plaintiff's Exhibit ("PX") 15; Op. at 5-6; PTO at 24.)

This was a hybrid lease/services agreement under which (a) Bethlehem

leased to Chesapeake certain land, office space, and the Bridge Crane,

and (b) Chesapeake agreed to provide marine stevedoring and terminal

services for Bethlehem using the Bridge Crane. (PX 15.) The Lease

had an initial term of seven years, which the parties later extended

through eight written amendments. (PX 15, 16, 17, 18, 19, 20, 21, 22

& 23.)

Under the 1992 Lease, Chesapeake "assume[d] the entire risk of

loss, theft, or destruction of the No. 4 Bridge Crane resulting from any

cause whatsoever." (PX 15 at ¶ 12.01(e).) In addition, the Lease

required Chesapeake to indemnify Bethlehem for losses arising out of

Chesapeake's actions, stating:

> Chesapeake shall . . . indemnify and save
> harmless the Bethlehem Companies from and

8

against all loss or liability for or on account of any
injury (including death) or damages received or
sustained by any person or persons (including the
Bethlehem Companies and any employee, agent,
or invitee thereof) by reason of any act or
omission, whether negligent or otherwise, on the
part of Chesapeake or any employee, agent,
subcontractor, representative, invitee, or business
visitor of Chesapeake, including any breach or
alleged breach of any statutory duty which is to
be performed by Chesapeake hereunder but
which is or may be the duty of any of the
Bethlehem Companies under applicable
provisions of law.

(PX 15 at ¶ 15.01.)  The Lease also required Chesapeake to maintain

the Bridge Crane and to pay for the electricity powering it.  (PX 15 at

¶¶ 8.03 & 12.01(d).)  And it specified how Chesapeake was to provide its

services—including the unloading of coke—and how much Bethlehem

was to pay for those services.  (PX 15 at ¶¶ 10.01-11.01.)

*The Bankruptcy Sale and Termination of the 1992 Lease*

In 2001, Bethlehem filed for bankruptcy in Bankruptcy Court for

the Southern District of New York ("Bankruptcy Court").  (Op. at 7;

PTO at 22-23.)  In December 2002—during the pendency of the

bankruptcy—Appellant Kinder Morgan Bulk Terminals, Inc. ("Kinder

Morgan"), acquired Chesapeake's assets, including an assignment of

Chesapeake's rights and liabilities under the 1992 Lease.  (Op. at 5, n.5; PTO at 24-25.)

In May 2003, however, the Bankruptcy Court approved the sale of all of Bethlehem's assets—including Sparrows Point—to International Steel Group Inc. ("ISG").  (Op. at 7-8; PTO at 23, 25.)  ISG did *not* accept assignment of the 1992 Lease.  (Op. at 8; PTO at 25.)  And on July 30, 2003, three months after the sale, the Bankruptcy Court entered an order rejecting the 1992 Lease.[4]  (Op. at 8; PTO at 25; IV:124.)  So as of that date, the 1992 Lease was terminated as a matter of law and no longer bound any party.  (Op. at 16) (finding that the "1992 Lease was not expressly in effect").

### The Interim Agreement

After taking over operations at Sparrows Point in May 2003, ISG did *not* enter into a new, comprehensive, long-term agreement with Kinder Morgan.  (Op. at 9.)  Nevertheless, ISG sought assurances that Kinder Morgan would continue providing the same stevedoring services that it had been providing to Bethlehem under the 1992 Lease.  Thus,

---

[4] As amended, the 1992 Lease had been scheduled to expire in 2007. (IV:15-16.)

ISG and Kinder Morgan entered into an "Interim Agreement," under which the parties would act "as if bound" by the 1992 Lease—albeit *only* for a limited period.  (Op. at 8; PTO at 25-26.)

The Interim Agreement was dated May 14, 2003.[5]  (PTO at 25; PX 24.)  It stated:

> During the Interim Period, Kinder Morgan shall continue to provide services at the Facility under the same terms and conditions as reflected in the Contract [i.e., the 1992 Lease, as amended] and ISG-SP shall perform as if bound by all of Bethlehem's rights and obligations under the Contract.

(PX 24.)  The agreement defined the "Interim Period" as follows:

> The Interim Period shall commence on the Closing Date [i.e., May 7, 2003] and end on the earlier of (a) the date ISG-SP takes assignment of the Contract, (b) the date ISG-SP and Kinder Morgan sign a new contract(s) for services or (c) 90 days after the Closing Date.

(*Id.*)  The first two contingencies did not occur: ISG did not take assignment of the 1992 Lease and ISG and Kinder Morgan did not sign a new contract for services. (Op. at 8-9; IV:21-30.)  On July 28, 2003, however, ISG and Kinder Morgan amended the Interim Agreement to

---

[5] This was before ISG had decided not to take assignment of the 1992 Lease and before the Bankruptcy Court rejected the 1992 Lease.

extend the Interim Period to the "earlier of: (a) the date ISG-SP and Kinder Morgan sign a new contract(s) for services or (b) December 31, 2003." (PX 25.) Similar amendments extended the Interim Period to June 30, 2004, December 31, 2004, June 30, 2005, and—under the last extension—to December 31, 2005.[6] (PX 26, 27, 28 & 29.)

The parties, however, never entered into a new long-term contract to replace the 1992 Lease. (Op. at 9; IV:23-30.) Kinder Morgan, who wished to undertake capital improvements at the A Yard, tired of continually deferring the issue. (IV:23-30.) It made various proposals for a new contract, but its efforts were unavailing: there was no response to Kinder Morgan's overtures and the parties did not enter into a new long-term contract. (Op. at 9; IV:23-30.) Kinder Morgan refused to extend the Interim Agreement beyond December 31, 2005. (Op. at 9.) Thus, as of December 31, 2005—when the last extension to the Interim Agreement expired—neither party had any obligations under the terms of the 1992 Lease.

---

[6] In April 2005, ISG merged with, and became a wholly owned subsidiary of Mittal Steel, N.V. (together with its subsidiaries, "Mittal"). So ISG became a subsidiary of Mittal.

*The Purchase Orders*

After December 31, 2005, the only written agreements between the parties were purchase orders for the various services that Kinder Morgan supplied.  (Op. at 9, 16.)  Even before the expiration of the Interim Agreement—indeed, dating back to the Bethlehem Steel days— the plant had issued blanket purchase orders for the services that Kinder Morgan and Chesapeake supplied.  (Op. at 7.)  Kinder Morgan and Chesapeake referenced those purchase orders when invoicing the mill for their work.  (*Id.*)

But those earlier purchase orders expressly incorporated the terms and conditions of the 1992 Lease.[7]  (Defendant's Exhibit ("DX") 2 & 3, IV:36-37.)  For example, the March 23, 2005 Purchase Order issued by ISG stated: "REFER TO TERMS & CONDITIONS OF LEASE AND MARINE TERMINAL SERVICES AGREEMENT, AND ITS AMENDMENTS."  (DX 3.)

---

[7] They also contained boilerplate language stating that ISG's terms and conditions applied, but under settled contract principles, the added reference to the 1992 Lease controlled over the pre-printed boilerplate. *See* 11 Williston on Contracts § 32:13.

13

After the expiration of the Interim Agreement at the end of 2005,
however, the purchase orders *did not* reference the 1992 Lease. (Op. at
10; DX 6.) For instance, ISG's January 31, 2006 Purchase Order—
requesting various services, including discharge of coke vessels—no
longer referenced the 1992 Lease's terms and conditions. (DX 6.)
Instead, the sole reference to terms and conditions was the pre-printed
statement: "International Steel Group Terms and Conditions of
Purchase Dated August 1, 2004 Apply," which appeared at the bottom
of each page. (*Id.*) From January 2005 through the June 2008 accident,
the only express agreements in effect between Kinder Morgan and ISG
(and ISG's successors, see below) were purchase orders. (Op. at 9)
(stating that it was undisputed that the 1992 Lease and the Interim
Agreement were no longer expressly in effect).

### Changes in Ownership of Sparrows Point From 2005-08

Between 2005 and 2008, Sparrows Point changed hands three
times. (Op. at 8; PTO at 23-24.) In April 2005, ISG merged with, and
became a wholly owned subsidiary of Mittal Steel, N.V. (together with
its subsidiaries, "Mittal"). (Op. at 8; PTO at 23.) Mittal then took
ownership of the plant. (Op. at 8; PTO at 23.) In July 2006, Mittal

merged with Arcelor, S.A. ("Arcelor") to become ArcelorMittal, S.A. (together with its subsidiaries, "ArcelorMittal"). (Op. at 8, PTO at 23.) Due to antitrust concerns, however, the U.S. District Court for the District of Columbia ordered ArcelorMittal to divest itself of the Sparrows Point facility. (Op. at 8; PTO at 23.) So in May 2008, ArcelorMittal sold it to OAO Severstal. (Op. at 8, PTO at 23.) During the acquisition, Severstal Sparrows Point Holding LLC, a subsidiary of OAO Severstal, merged with ISG-SP, a subsidiary of ArcelorMittal, to become Severstal Sparrows Point, LLC ("Severstal"). (Op. at 8; PTO at 23-24.) After the merger, Severstal owned Sparrows Point, including the Bridge Crane. (Op. at 8; PTO at 24.)

### The February 21, 2008 Purchase Order

On February 21, 2008, Sparrows Point's then-owner ArcelorMittal issued a purchase order (the "February 21, 2008 Purchase Order" or "Purchase Order") requesting that Kinder Morgan provide stevedoring services unloading coke from cargo ships. (Op. at 11; DX 9; PX 45.) The Purchase Order requested, in relevant part, "UNLOADING UP TO 500,000 NTON OF COKE FROM SHIPS WITH BRIDGE CRANE." (DX 9.) The agreed rate for this service was $3.38 per ton. (*Id.*)

15

The February 21, 2008 Purchase Order *did not* reference the 1992 Lease.  (*Id.*)  Instead, it incorporated the "ArcelorMittal USA and Subsidiary Companies General Purchasing Conditions for Purchase of Goods or Services or Both Goods and Services" ("AMUSA-100").  (DX 9; DX 10.)

Among the detailed terms and conditions was a limitation on consequential damages:

> IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER UNDER THIS ORDER FOR CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, REVENUES, PRODUCTION OR BUSINESS (COLLECTIVELY "CONSEQUENTIAL DAMAGES"); PROVIDED, HOWEVER, THAT FOR PURPOSES OF THE FOREGOING LIMITATION, CONSEQUENTIAL DAMAGES SHALL NOT INCLUDE ANY OBLIGATIONS TO DEFEND, INDEMNIFY OR HOLD HARMLESS OR OTHER LIABILITIES TO WHICH EITHER PARTY HAS EXPRESSLY AGREED UNDER THIS ORDER, WHETHER OR NOT THE UNDERLYING CAUSE FOR EITHER PARTY HAVING TO PERFORM ITS OBLIGATIONS TO DEFEND, INDEMNIFY OR HOLD HARMLESS OR BE LIABLE TO THE OTHER PARTY WOULD OTHERWISE UNDER LAW BE DEEMED TO BE CONSEQUENTIAL DAMAGES.

(DX 10 at ¶ 7.6.)  The AMUSA-100 terms and conditions also stated

explicitly that Kinder Morgan did not have any ownership interest in

any of ArcelorMittal's property that Kinder Morgan used during the

performance of the agreement:

> All right, title and interest (including without
> limitation any security interest(s)) to and in any
> of [ArcelorMittal's] property that has been placed
> into [Kinder Morgan's] possession or custody . . .
> shall at all times be and remain [ArcelorMittal's]
> alone, and [Kinder Morgan] shall have no
> ownership  or other interest therein.

(DX 10 at ¶ 18.)  Thus, the parties expressly agreed that Kinder Morgan

did not have any interest—ownership, leasehold, security, or

otherwise—in the Bridge Crane.

As noted above, ArcelorMittal was at the time under an order to

divest Sparrows Point.  (Op. at 8; PTO at 23.)  The Feb. 21, 2008

Purchase Order contained language authorizing assignment of

ArcelorMittal's rights under it.  (DX 9.)  Severstal acquired Sparrows

Point in May 2008 (i.e., after the February 21, 2008 Purchase Order but

before the June 4, 2008 accident).  (Op. at 8; PTO at 23-24.)  On May 1,

2008, Severstal's Vice President of Purchasing and Transportation,

Cheryl Hurt, sent Kinder Morgan a letter apprising it of the acquisition,

and reaffirming that "there have been no changes in commercial terms . . . at this time." (DX 10.) The letter attached the AMUSA-100 terms and conditions, which included the provision quoted above. (*Id.*) Hurt separately told Dixon Betz, Kinder Morgan's Vice President for Business Development, that "[w]e do things the Severstal way, and we do things on Severstal's paper." (IV:49.)

*The Collapse of the Bridge Crane*

On June 4, 2008, Kinder Morgan was using the Bridge Crane to unload coke from the M/V *Joy Sea*, a cargo vessel. (Op. at 11.) The day started clear and sunny. (*Id.)* But a severe storm developed suddenly in the afternoon. (*Id.* at 11-12.) The National Weather Service issued a severe thunderstorm warning at 2:55 p.m. (*Id.* at 12.) At around 3:20 p.m., Diana Lynn, a Kinder Morgan administrative assistant, received a weather alert on her computer. (*Id.*) She told Michael Zorn, the foreman, about it and Zorn immediately left the office to secure the Bridge Crane before the storm hit. (*Id.* at 12-13.)

18

Zorn was able to place two chocks on each leg of the Bridge Crane.[8]  (Op. at 12.)  At that point, the storm prevented any further attempts to secure it.  (*Id.*)  The unusual ferocity of the storm's winds was unpredicted.  (*Id.* at 13.)  An anemometer on the crane's "bridging station" registered a wind speed of 92 miles an hour.  (*Id.*)  The chocks on the leg farthest from the water did not hold, causing that leg to slip down the rails, while the other leg held firm.  (*Id.*)  This twisted the structure and caused it to collapse.  (*Id.*)  Although there were two employees operating the Bridge Crane at the time, neither was injured.  (*Id.*)  The Bridge Crane, on the other hand, was a total loss.  The collapse also damaged the "L-14" conveyor system (which carried coke from the A Yard to the blast furnace).  (Op. at 14.)

*The Bench Trial and the District Court's
Findings of Fact and Conclusions of Law*

The Amended Complaint asserts claims sounding in both tort and contract.  Plaintiff RG Steel Sparrows Point, LLC ("RG Steel"),

---

[8] Zorn wanted to put four chocks on the leg closest to the water, but was unable to return to it before the storm hit.  In any event, that leg was not the leg that moved.  (Op. at 12.)

Severstal's successor in interest,[9] contends that Kinder Morgan was bound by the terms and conditions of the 1992 Lease, including the assumption-of-risk and indemnity provisions quoted above.  (Am. Compl. ¶ 106-07.)  It further contends that Kinder Morgan was negligent in its operation of the Bridge Crane, resulting in its collapse.  (*Id.* ¶ 134-37.)  Kinder Morgan denied these allegations, arguing that the matter was governed by the February 21, 2008 Purchase Order (including the AMUSA-100 terms and conditions) and that its operation of the Bridge Crane was reasonable and appropriate under the circumstances known and existing at the time of the Bridge Crane's collapse.  (Def's Concls. Law, D.E.#163-1 at 9-11, 22.)

The District Court conducted a seven-day bench trial in November and December 2013.  On March 6, 2014, the District Court issued its Findings of Fact and Conclusions of Law.  (Op. at 1-47.)  On the contract issue, the District Court agreed with Kinder Morgan that, after

---

[9] Severstal brought this action on June 24, 2009.  On March 31, 2011, RG Steel purchased Severstal's stock and the entity is now known as RG Steel Sparrows Point, LLC.  RG Steel subsequently declared bankruptcy and has sold Sparrows Point pursuant to an order of the United States Bankruptcy Court for the District of Delaware.  (Op. at 1.)

December 31, 2005, the 1992 Lease was no longer expressly in effect. (*Id.* at 16.)  But it held that the parties' later conduct—including that Kinder Morgan continued to occupy land on Sparrows point, continued to pay rent for the land, continued to pay utilities, continued to maintain the Bridge Crane, and occasionally referred to the 1992 Lease as if it were still in effect—established an implied-in-fact contract whereby the parties agreed to continue to be bound by the terms and conditions of the 1992 Lease.  (*Id.* at 20-21.)  Although the District Court acknowledged that Kinder Morgan was operating pursuant to the February 21, 2008 Purchase Order at the time of the collapse, it rejected Kinder Morgan's argument that the Purchase Order's terms controlled.  (*Id.* at 11.)  Thus, it rejected Kinder Morgan's arguments that RG Steel could not recover any consequential damages in the case. (*Id.* at 21) (finding that RG Steel could "recover, if proven, all categories of damages claimed.")

At trial, RG Steel advanced several theories of negligence.  (Op. at 22.)  It claimed that Kinder Morgan was negligent: (a) for failing to tie down the Bridge Crane on the day in question, (b) for failing to subscribe to a weather monitoring service, (c) for failing to comply with

OSHA requirements, and (d) for failing to maintain automatic rail clamps on the Bridge Crane. (*Id.*)

The District Court rejected all of these theories except the one regarding automatic rail clamps. (Op. at 23.) Citing expert testimony that that the standard of care required automatic rail clamps and that such clamps would have prevented the Bridge Crane's collapse, the District Court found that Kinder Morgan was negligent and that this negligence caused the accident.[10] (*Id.* at 24-26.) It rejected Kinder Morgan's act-of-god and contributory-negligence affirmative defenses. (*Id.* at 26-27.)

The District Court then turned to damages. (Op. at 27.) RG Steel sought both direct and consequential damages. (PTO at 28-30.) Disregarding the Purchase Order's limitation on consequential damages, the District Court analyzed both classes of damages. For direct damages, the District Court awarded $5.3 million for the loss of the Bridge Crane.[11] (*Id.* at 32.) The District Court also awarded $804,963 for the cost of emergency repairs in the wake of the Bridge

---

[10] Kinder Morgan is not challenging that ruling on appeal.

[11] An amount that it later amended to $7,066,666. *See infra* at 26.

22

Crane's collapse, and $1,069,000 for the cost of rebuilding a conveyor that was damaged in the accident.[12] (*Id.* at 46.)

As for indirect and consequential damages, the District Court first awarded $2,734,182 in "incremental demurrage" charges. (Op. at 34.) This represented contractual amounts that RG Steel claimed it paid to shipowners for delays in unloading caused by the accident. (*Id.* at 32-34.) Only two ships were actually prevented from unloading at the A Yard during the months in question, representing demurrage of $416,755. (*Id.* at 32.) But, relying on the testimony of RG Steel's expert economist, Jeffrey Cohen—whose testimony Kinder Morgan sought to exclude at trial because he lacked any expertise or experience in the field[13]—the District Court concluded that congestion from the accident

---

[12] It rejected RG Steel's contract claim for repairs to the dock and dredging, finding (1) that Kinder Morgan's obligations ran only to the dockface—not the underlying structure of the dock itself—and that Kinder Morgan had complied with its obligations to maintain the dockface, and (2) there was no evidence that Kinder Morgan failed to comply with dredging obligations or that RG Steel suffered any damages from this alleged breach. (Op. at 44-46.)

[13] Additional facts concerning Cohen's lack of qualifications and the flaws in his analysis of demurrage and changes in commercial terms are provided in Section II of the Argument.

delayed other ships, too, thereby incurring increased demurrage. (*Id.* at 33-34.)

The District Court also relied on Jeffrey Cohen's testimony in awarding $1,064,507 for "changes in commercial terms." (Op. at 40-44.) Freight rates typically are included in contracts to purchase coke. (*Id.* at 40.) Despite his unfamiliarity with the field, Cohen reasoned that: (1) the accident reduced the rate at which coke could be unloaded, (2) the reduction in coke unloading capacity would have increased the unloading time of cargo ships, (3) this would have increased shipping costs, and (4) this would have increased the amount RG Steel paid for coke during the period of diminished unloading capacity. (III:102-05.) Cohen quantified this at $1,526,104, but the District Court held that this overstated the matter because it included a period after August 2011, when unloading had been restored to full capacity. (Op. at 42-44.)

The third class of consequential damages the District Court awarded was $2,816,566 for increased handling charges following the accident. (Op. at 37.) This included $2,055,439 for additional stevedoring charges, and $761,137 for RG Steel's payments for using hoppers necessitated by the accident. (*Id.* at 34-37.) The District Court

rejected RG Steel's estimate of $4,993,863 for such damages (based on Cohen's "incremental handling analysis"), noting that "it was not entitled to weight as it was divorced from actual data relating to increased handling charges." (*Id.* at 37.)

Finally, the District Court rejected RG Steel's damages claim for "incremental degradation damages"—i.e., damage to coke from the increased handling necessitated by the accident. (*Id.* at 37-40.) Once again, RG Steel based this claim on an analysis prepared by its economist, Jeffrey Cohen. The District Court noted that Cohen "was not qualified to offer an opinion" on the issue as "he had no experience with coke." (*Id.* at 39.) And it credited Kinder Morgan's evidence that actual measurements revealed no increase in degradation after the accident. (*Id.* at 39-40.)

Based on these findings and conclusions, the District Court entered judgment in favor of RG Steel for $13,789,218. (3/6/14 Judgment Order, D.E. #171.) On March 24, 2014, RG Steel moved to amend the judgment, arguing that the District Court had made an algebraic error in computing the replacement value of the Bridge Crane and that the true value should be $7,066,666, not $5,300,000. The

District Court agreed and, on May 6, 2014, increased the judgment amount to $15,555,884. (5/6/14 Order Granting Mtn. to Am. Judgment, D.E. #183.)

This appeal followed. (5/22/14 Am. Notice of Appeal, D.E. #184.)

## SUMMARY OF THE ARGUMENT

The District Court's decision improperly allowed an implied-in-fact contract to trump an express written agreement between the parties on the same subject matter.

The February 21, 2008 Purchase Order—along with the AMUSA-100 terms and conditions that it incorporated—constituted an offer for Kinder Morgan to use the Bridge Crane to unload coke for the Sparrows Point mill. Kinder Morgan's performance under that Purchase Order was an acceptance of that offer. This created an express written agreement between the parties. The AMUSA-100 terms and conditions, which were part of that express contract, barred consequential damages and disclaimed any leasehold interest that Kinder Morgan might have had in the Bridge Crane. Thus, the District Court should have rejected RG Steel's contract claim and should have excluded consequential damages from its final judgment award.

26

The District Court, however, ignored the February 21, 2008 Purchase Order and instead held that there was an implied-in-fact agreement between the parties to abide by the 1992 Lease (the express terms of which had not been in effect since the end of 2005). This was error. An implied-in-fact contract cannot coexist with an express contract on the same subject matter. Here, there was an express written contract (the February 21, 2008 Purchase Order) that dealt with the same subject matter as the purported implied-in-fact contract (using the Bridge Crane to unload coke). The parties' obligations were defined by the express contract, not the purported implied contract.

The District Court also erred in awarding $2,734,182 million in damages for increased demurrage and $1,064,507 million for changes in commercial terms. RG Steel relied on the testimony of Jeffrey Cohen to establish these damages. But Cohen admitted that he lacked any experience on these issues—he had never computed demurrage damages and was unfamiliar with maritime contracts. To offer expert-opinion testimony, however, a witness must have expertise and experience in the relevant subject matter. So the District Court should have barred him altogether from testifying on these matters.

Furthermore, the testimony that Cohen did offer was insufficient, as a matter of law, to satisfy RG Steel's burden to establish damages to a reasonable degree of certainty. Cohen failed to consider other potential causes for the increase in demurrage and the changes in coke prices. And the methodology he used was, on its face, unreliable and lacked any basis in established industry methods for computing such figures. The District Court erred as a matter of law in basing nearly $4 million of its damages award on the testimony of a purported expert who admitted at trial that he had no prior experience in the field and was just learning as he went along.

## ARGUMENT

I. **The District Court erroneously allowed an implied contract to supersede the parties' express contract on the same subject matter.**

### A. Standard of Review

In an appeal from a bench trial, this Court reviews a district court's factual findings for clear error and its legal conclusions de novo. Fed. R. Civ. P. 52(a)(6); *F.T.C. v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014) (citing Fed. R. Civ. P. 52 and *Helton v. AT & T, Inc.*, 709 F.3d 343, 351 (4th Cir. 2013)).

### B.    The February 21, 2008 Purchase Order governed the parties' relationship with respect to the unloading of coke.

The contract issues in this case are straightforward.  As elaborated below, the February 21, 2008 Purchase Order represented an offer to purchase stevedoring services.  Kinder Morgan accepted that offer by performing those services.  That created a binding contract between the parties.  Because Kinder Morgan was performing those services at the time of the accident, the Purchase Order's terms and conditions controlled.  The District Court erred by ignoring these bedrock principles.

#### 1.    Neither the 1992 Lease nor the Interim Agreement was in effect at the time of the Bridge Crane collapse.

Before analyzing the Purchase Order, it is important to emphasize what was indisputably *not* the contract at the time of the accident.  To begin with, the operative contract was *not* the 1992 Lease.  ISG purchased Sparrows Point during Bethlehem Steel's bankruptcy but refused to assume the 1992 Lease.  And the Bankruptcy Court subsequently rejected the 1992 Lease, thereby terminating it as a matter of law.  11 U.S.C. § 365(h)(1)(A)(i).  So neither Kinder Morgan,

ISG, Bethlehem, nor anyone else had any obligations under that instrument. It was a dead letter.

Equally indisputable is the fact that the operative contract was *not* the Interim Agreement and its amendments. The last such amendment extended the Interim Period—the period during which ISG and Kinder Morgan would act "as if" the 1992 Lease were still in effect—only to December 31, 2005. Although Kinder Morgan proposed new long-term lease agreements, ISG did not accept those proposals. So after December 31, 2005, the parties were not operating under any express written lease.[14]

In its opinion, the District Court agreed that neither of these agreements was in effect at the time of the accident:

> There is no dispute that, at the time the Bridge Crane collapsed, the last Interim Agreement extending the term of the Lease had expired and the 1992 Lease was not expressly in effect.

(Op. at 16.) The contract analysis in this case instead centered on whether the parties rights' and obligations were governed by: (1) the

---

[14] Jeffrey Gennuso, RG Steel's Corporate Controller and corporate representative at trial, conceded that "there was not a rental charge for the crane" at the time of the accident. (II:53.)

February 21, 2008 Purchase Order, or (2) an implied contract to continue operating under the same terms as the 1992 Lease.

2.    The Purchase Order constituted a
written offer to enter into contract.

The undisputed facts show that, at the time of the accident, the parties were operating under the February 21, 2008 Purchase Order. Relevant here, on February 21, 2008, ArcelorMittal sent Kinder Morgan a blanket purchase order for stevedoring services.  (DX 9.)  That purchase order set forth the key parameters for Kinder Morgan's provision of these services.  It specified the quantity of coke to be unloaded (up to 500,000 tons).  (*Id.*)  It specified a unit price ($3.38 per ton).  (*Id.*)  It specified where it was to be unloaded (Gate C of the Blast Furnace Warehouse).  (*Id.*)  It specified payment terms (cash 30 days). (*Id.*)  And it specified how Kinder Morgan was to unload the coke, stating that it should be done "WITH BRIDGE CRANE."  (*Id.*)  The Purchase Order thus defined the essential terms of the parties' relationship vis-à-vis the unloading of coke using the Bridge Crane.

In addition to these specific terms, the Purchase Order also contained detailed general provisions.  It incorporated by reference ArcelorMittal's  "General Purchasing Conditions for Purchase of Goods

31

or Services or Both Goods and Services," which ArcelorMittal referred
to as "AMUSA-100." These eight pages of detailed commercial terms—
insisted upon by ArcelorMittal and Severstal, RG Steel's predecessors
in interest—addressed such issues as payment conditions, safety,
warranties, indemnity, intellectual property rights, termination,
subcontracting, assignment, and choice of law.

A purchase order constitutes a valid offer where it contains
sufficient detail to constitute an enforceable contract. *See Audio Visual
Associates, Inc. v. Sharp Electronics Corp.*, 210 F.3d 254, 259 (4th Cir.
2000) (applying Maryland law) ("[T]he offer usually takes the form of a
purchase order, providing product choice, quantity, price, and terms of
delivery."); *USEMCO, Inc. v. Marbro Co.*, 483 A.2d 88, 93 (Md. Ct. Spec.
App. 1984) (holding that purchase order for sewage-treatment
equipment constituted an offer); *Transpacific Tire & Wheel, Inc. v.
Orteck Int'l, Inc.*, Civ. No. 2006-187, 2010 WL 1375292, *8 (D. Md. Mar.
30, 2010) (applying Maryland law) ("Courts have typically regarded a
written purchase order as an offer to buy.") (citing *USEMCO*), *aff'd sub
nom. Orteck Int'l, Inc. v. TransPacific Tire & Wheel, Inc.*, 457 Fed. Appx.
256, 257 (4th Cir. 2011); *Townsend Properties v. Z.N., Inc.*, Civ. No. 93-

32

3918, 1994 WL 750537, at *2 (D. Md. Nov. 15, 1994) (holding that, under Maryland version of the UCC, a purchase order constituted an offer).

The February 21, 2008 Purchase Order contained all terms necessary to define the parties' relationship with respect to the unloading of coke at the plant. Accordingly, it was a valid offer.

>    3.    Kinder Morgan accepted this offer by performing under the agreement.

Under Maryland law, a party need not accept an offer verbally or in writing; acceptance can be accomplished by a party's actions. *Porter v. General Boiler Casing Co., Inc.*, 396 A.2d 1090, 1094 (Md. 1979) ("Acceptance can be accomplished by acts as well as words; no formal acceptance is required."); *Thomas v. Capital Medical Management Assocs., LLC*, 985 A.2d 51, 63 (Md. Ct. Spec. App. 2009) (holding that party accepted contract by performance).

Relevant here, a party's performance of a purchase order— delivering the requested goods or services—constitutes acceptance. *Audio Visual Associates*, 210 F.3d at 259 ("The seller may also accept simply by performance and delivery of the goods."); *Orteck Int'l, Inc.*, 457 Fed. Appx. at 257 ("TransPacific accepted Orteck's offer for each

33

contract by shipping the tires described in Orteck's purchase order");
*Townsend Properties v. Z.N., Inc.*, 1994 WL 750537, at *2 (holding that
seller's shipment of goods specified in purchase order constituted
acceptance of purchase order's terms).

Here, Kinder Morgan accepted ArcelorMittal's offer by performing
under the Purchase Order. There is no dispute that, after issuance of
the Purchase Order, Kinder Morgan supplied the stevedoring services
that the Purchase Order requested. Indeed, the District Court found as
much, holding that "[a]t the time of the Bridge Crane collapse, Kinder
Morgan *was unloading coke pursuant to a February 21, 2008 Purchase
Order*." (Op. at 11) (emphasis added).

Because there was an offer, acceptance, and consideration, the
Purchase Order constituted a binding written contract. *Spaulding v.
Wells Fargo Bank, N.A.*, 714 F.3d 769, 777 (4th Cir. 2013) ("Under
Maryland law, '[t]he formation of a contract requires mutual assent
(offer and acceptance), an agreement definite in its terms, and sufficient
consideration.'") (quoting *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392
F.3d 114, 123 (4th Cir. 2004)); *ABT Assocs., Inc. v. JHPIEGO Corp.*, 9
Fed. Appx. 172, 176 (4th Cir. 2001) (applying Maryland law) ("To

34

establish that a binding contract was made, a plaintiff must adduce

evidence of an offer and an acceptance, and of a meeting of the minds as

to the essential terms of the contract.").

### C. The District Court erroneously disregarded the Purchase Order.

In its opinion, however, the District Court disregarded this

express written contract, concluding instead that the parties were

governed by an implied contract established by the parties' course of

dealing.  In doing so, the District Court erred both factually and legally.

> 1.  Contrary to the District Court's finding, the Purchase Order expressly refers to the Bridge Crane.

Factually, the District Court erred because it based its conclusion

on a misreading of the Purchase Order.  The District Court justified its

disregard of the Purchase Order by stating, incorrectly, that the

Purchase Order did not mention the Bridge Crane:

> Although Kinder Morgan contends that the
> purchase orders and AMUSA terms and
> conditions represented the entirety of the parties'
> relationship, *neither document refers specifically
> to the Bridge Crane or any of the obligations that
> Kinder Morgan continued to perform.*

(Op. at 20) (emphasis added).  A review of the February 21, 2008

Purchase Order, however, belies this assertion.  Contrary to the District

Court's claim, the document specifically references the bridge crane and describes the unloading services that Kinder Morgan was to provide. The Purchase Order states that the contract was for "UNLOADING UP TO 500,000 NTON OF COKE FROM SHIPS ***WITH BRIDGE CRANE***." (DX 9) (emphasis added). The District Court thus plainly erred in finding that the Purchase Order did not reference the Bridge Crane or Kinder Morgan's duties vis-à-vis unloading coke using the Bridge Crane.

This error alone warrants reversal, as it was central to the District Court's analysis. The District Court justified its disregard of the Purchase Order by noting, in part, that it "does not include any terms that can reasonably be construed as . . . authorizing Kinder Morgan to use[] the Bridge Crane." (Op. at 20.) But the Purchase Order unmistakably states that Kinder Morgan was to perform its stevedoring services "WITH BRIDGE CRANE." Thus, the District Court based its decision to disregard the Purchase Order on a false factual premise.

> 2. The District Court wrongly allowed an
>    implied contract to trump an express
>    written agreement between the
>    parties.

Legally, the District Court committed an even more fundamental error: it allowed a purported implied-in-fact contract to supersede the parties' express written agreement covering the same subject matter.

In its opinion, the District Court noted that "an implied in fact contract may exist . . . where circumstantial evidence, such as the parties' conduct, rather than an explicit set of words, demonstrates mutual assent." (Op. at 19.)  Turning to the facts of the present case, it found that "the course of the parties' conduct demonstrates conclusively to the Court that the parties intended and continued to operate pursuant to the 1992 Lease."  (Op. at 21.)

Under Maryland law, however, a party may not maintain an action for an implied contract where, as here, an express agreement exists between the parties on the same subject matter.  *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000) (holding that plaintiff could not assert quasi-contract claim in the face of an express contract on the same subject matter because "[t]o hold otherwise would turn the basic foundation of contract law on

37

its ear'"); *First Nat'l Bank of Md. v. Burton, Parsons & Co.*, 470 A.2d 822, 829 (Md. Ct. Spec. App. 1984) ("When there is an express contract dealing specifically with  the services rendered, quantum meruit is unavailable."); *CDC-LCGH, LLC v. Mayor*, 313 F. App'x 637, 641 (4th Cir. 2009) (applying Maryland law) (holding that existence of valid lease barred quasi-contract claims); *Louers v. Lacy*, 2013 WL 6257572, *7 (D. Md. Dec. 3, 2013) (applying Maryland law) (holding that presence of express contract barred claim under implied-in-law contract).[15]

In *County Commissioners of Caroline County*, for example, the Maryland high court addressed whether a party could assert a quasi-contract claim where there was an express written agreement that governed the parties' relationship.  The plaintiff in that case was a contractor whom the county had hired to renovate a detention center.  In its complaint, the contractor sought damages for delays caused by circumstances for which it was not responsible.  And it also sought to recover funds that the county had withheld under a liquidated-damages provision.  The contractor asserted counts for breach of contract,

---

[15] Kinder Morgan asserted this argument below, but the District Court's opinion failed to address it.  (KM's Post-Trial Concls. of Law D.E. # 163 at 12-13, 17-18.)

quantum meruit, and unjust enrichment. The county moved to dismiss, noting that the contractor had not brought the action within the contract's 21-day limitation period. The trial court granted this motion. The Maryland Court of Special Appeals reversed the dismissal of the unjust enrichment claim. On further appeal, however, the Maryland Court of Appeals reinstated the trial court's ruling dismissing the unjust enrichment claim.

In its analysis, the court first noted that unjust enrichment was a species of quasi-contract—i.e., a legal fiction that the law creates to permit a contractual remedy where there is, in fact, no contract but where circumstances warrant recovery as if there had been one. *Id.* at 606-07. Next, it recited the general rule that quasi-contractual relief is not available where there is an express contract between the parties concerning the same subject matter. *Id.* Applying those principles, the court held that "[t]he contract defined the entire relationship of the parties with respect to its general subject matter" and refused to allow the contractor, "via a theory of unjust enrichment" to obtain relief covered by the contract. *Id.* at 610. It reasoned that "[t]o hold otherwise would turn the basic foundation of contract law on its ear."

*Id.* Thus, it concluded that "quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *Id.*

The present case differs slightly from *County Commissioners of Caroline County* inasmuch as it concerns a purported implied-in-*fact*, not implied-in-*law*, contract. *Id.* at 606 (defining an implied-in-fact contract as one that is "inferred from conduct of parties.") There is no Maryland authority addressing whether the existence of an express contract defeats an implied-in-fact contract claim.[16] But the Court of Appeals' reasoning in *County Commissioners of Caroline County* applies with equal force to implied-in-fact contracts. Allowing a party to circumvent the terms of a written agreement by arguing that there was

---

[16] There are two District of Maryland cases on point, but they apply the law of other jurisdictions. *See havePOWER, LLC v. General Elec. Co.*, 183 F. Supp. 2d 779, 787 (D. Md. 2002) (applying New York law and stating that "'the prerequisite for [an implied-in-fact] contract is that there be no express agreement dealing with the same subject matter.'") *(quoting Radio Today, Inc. v. Westwood One, Inc.*, 684 F. Supp. 68, 71 (S.D.N.Y. 1988)), *and Soft Stuff Distribs. v. Ryder Truck Rental, Inc.*, 2012 WL 3111679, *6 (D. Md. July 30, 2012) (applying Florida law and stating, "'[A] claim of an implied in fact contract cannot survive where a valid, express contract exists that covers the same subject matter.'") (quoting *White Constr. Co., Inc. v. Martin Marietta Materials*, 633 F. Supp. 2d 1302, 1334 (M.D. Fla. 2000)) (brackets in original).

a separate, implied, agreement on the same subject matter would undermine the stability of written agreements.  It would, as the Court of Appeals put it, "turn the basic foundation of contract law on its ear." *Id.* at 610.

For this reason, courts in other jurisdictions apply the same rule to implied-in-fact contracts as they do to implied-in-law contracts, refusing to countenance implied contracts where the parties have an express agreement concerning the same subject matter.[17]  *See* 1 Williston on Contracts § 1:5 ("The law may recognize an implied contract in the absence of an express contract on the same subject matter, but not where there is an express contract, a rule that is often stated as well with respect to quasi contracts or contracts implied at law.").  These cases universally reject claims based on implied-in-fact contracts where there is a valid express contract between the parties

---

[17] In an analogous area of contract law, Maryland courts refuse to recognize an implied contract term where there is an express term covering the same subject.  *See Myers v. Kayhoe*, 892 A.2d 520, 528 (Md. 2006) (holding that "an express term negates 'an implied, inconsistent term relating to the same aspect of the contract'").

covering the same subject matter.[18]  Simply put, "the theories of express

contract and of contract implied in fact are mutually exclusive."  *Watts

v. Columbia Artists Mgt., Inc.*, 591 N.Y.S.2d 234, 236 (N.Y. App. Div.

1992).

The Purchase Order was a valid written contract governing

Kinder Morgan's unloading of coke using the Bridge Crane.  The

---

[18] For U.S. Court of Appeals opinions on point, s*ee Marcatante v. City of Chicago*, 657 F.3d 433, 440 (7th Cir. 2011) (holding that "an implied contract cannot coexist with an express contract on the same subject") (internal quotation marks, bracket, and citation omitted); *Rick's Mushroom Service, Inc. v. United States*, 521 F.3d 1338, 1344 (Fed. Cir. 2008) ("[T]his court may only find an implied-in-fact contract when there is no express contract."); *Pepsi-Cola Bottling Co. of Pittsburg, Inc.*, 431 F.3d 1241, 1257 (10th Cir. 2005) (holding that "a contract cannot be implied in fact where an express contract covers the subject matter involved"); *Schism v. U.S.*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) ("It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract."); *Roedler v. Department of Energy*, 255 F.3d 1347, 1353-54 (Fed. Cir. 2001) (holding that "the existence of an express contract" between the parties "negates the existence of an implied-in-fact contract"); *Matter of Penn Cent. Transp. Co.*, 831 F.2d 1221, 1229 (3d Cir. 1987) (rejecting both implied-in-fact and implied-in-law theories and noting that "no implied-in-fact contract can be found when, as here, the parties have an express agreement dealing with the same subject"); *Rockwood Manufacturing Corp. v. AMP, Inc.*, 806 F.2d 142, 144 (7th Cir. 1986) ("[T]here can be no implied contract where an express contract exists between the same parties regarding the same subject matter.").

42

District Court, moreover, specifically found that "[a]t the time of the Bridge Crane collapse, Kinder Morgan was unloading coke pursuant to a February 21, 2008, Purchase Order." (Op. at 11.) Under hornbook contract law, therefore, the existence of this express written contract forecloses any argument that an implied-in-fact contract governed Kinder Morgan's unloading of coke using the Bridge Crane.

The District Court's opinion, however, inverted these fundamental contract principles. It allowed an implied-in-fact contract (i.e., the purported agreement to continue along the same terms as the 1992 Lease) to trump an express written agreement between the parties (i.e., the February 21, 2008 Purchase Order). This was reversible error.

In reaching this erroneous legal conclusion, the District Court focused on exactly the wrong points. Its analysis centered on whether the parties' conduct tended to show that they believed themselves to be operating under the same general terms as the 1992 Lease.[19] But the

---

[19] Thus, for example, the District Court cited evidence that "Kinder Morgan repeatedly referenced the 1992 Lease as if it was still in operation and effect, even subsequent to the Bridge Crane collapse." (Op. at 20-21.) This refers to off-hand references in the title of a proposed long-term agreement (which was never accepted) and an invoice unrelated to the unloading of coke. (Op. at 10.) Relevant here,

*(note continued on following page . . . )*

District Court ignored the controlling instrument.  There was no need to divine the parties' implicit intentions vis-à-vis Kinder Morgan's use of the Bridge Crane to unload coke.  The parties' intentions were unambiguously and conclusively embodied in an express written agreement that encompassed that very subject.

Because of its improper focus on the parties' actions—and what they may or may not have shown about the parties' implicit intent—the District Court ignored the two issues that lay at the heart of Kinder Morgan's contract arguments: (1) whether the Purchase Order constituted a valid contract, and (2) if so, whether it superseded, as a matter of law, any purported implied contract.  That was clear legal error.

**D.    The District Court's errors regarding the Purchase Order undermine its liability and damages rulings.**

The District Court's error led it to reach unsound judgments on both liability and damages.  To begin with, the error undermined the

---

*(. . . note continued from previous page)*
the District Court did *not* hold that these represented an express contract.  Nor could it have.  They were, at most, evidence of an implied agreement.  Because an express contract supersedes any purported implied contract, these statements are legally irrelevant.

entire legal foundation for the District Court's breach-of-contract ruling.

The District Court based that ruling on the terms of "the [1992] Lease,

including, but not limited to, its obligation to indemnify RG Steel for

damages incurred." (Op. at 21.)  Yet the District Court had already

found that these terms no longer were *expressly* in effect (either from

the original 1992 Lease or from the Interim Agreement that extended

them).  (Op. at 16.)  So the only way those terms could apply is if there

were an *implicit* agreement to continue operating under them.  But, as

noted above, such an implied-contract theory is legally inconsistent with

the existence of the Purchase Order—an express agreement relating to

the same subject matter.  Thus, the defects in the District Court's

implied-contract analysis cause its entire contract ruling to unravel.

Correcting the error also substantially affects the damages

awarded in this case.  The Purchase Order incorporated AMUSA-100,

ArcelorMittal's terms and conditions.  Section 7.6 of the AMUSA-100

terms and conditions bars consequential damages:

> IN NO EVENT SHALL EITHER PARTY BE
> LIABLE TO THE OTHER UNDER THIS ORDER
> FOR CONSEQUENTIAL, INDIRECT OR
> SPECIAL DAMAGES, INCLUDING WITHOUT
> LIMITATION LOST PROFITS, REVENUES,
> PRODUCTION OR BUSINESS

(COLLECTIVELY "CONSEQUENTIAL
DAMAGES"). . . .

Thus, if the District Court had properly applied the terms of the

February 21, 2008 Purchase Order, then it would have excluded

consequential, indirect, and special damages.  The District Court,

however, did not do so.  Instead it applied the terms of the 1992 Lease

and ruled that RG Steel could seek to recover for "all categories of

damages under either the negligence or breach of contract theories."

(Op. at 27.)

　　　This was error.  Although it is clear that some of the claimed

damages were direct damages (i.e., emergency repairs, the loss of the

crane, and the cost of rebuilding the damaged L-14 conveyor) the

remaining damages that the District Court awarded were

"consequential, indirect or special damages."  Specifically, the District

Court awarded $2,734,182 for incremental demurrage charges,

$1,064,507 for changes in commercial terms, $2,055,429 for additional

stevedoring charges, and $761,137 for charges for the use of additional

hoppers.  These amount to $6,615,255 in damages for the indirect

consequences of the Bridge Crane's collapse.

Courts will enforce contract provisions that restrict liability to certain classes of liability or damages. *Wolf v. Ford*, 644 A.2d 522, 528 (Md. 1994) (holding that a clause in brokerage agreement that excluded stock broker's liability for negligence was enforceable and noting that "[i]f the parties to a contract determine that one party will bear the burden of the other party's simple negligence, they are entitled to do just that"); *Bullock Constr. v. Fed. Express Corp.*, 846 F.2d 69, *2 (4th Cir. 1988) (table) ("Parties to a contract can validly limit liability and totally exclude liability for consequential damages."); *Potomac Constructors, LLC v. EFCO Corp.*, 530 F. Supp. 2d 731, 736 (D. Md. 2008) (holding that a purchase-order provision that limited damages to repair and replacement of item was enforceable).

This is particularly so where, as here, the contract is between sophisticated commercial entities. *Potomac Constructors, LLC,* 530 F. Supp. 2d at 736 ("[I]n commercial settings, 'the rule that the agreed-upon allocation of commercial risk should not be disturbed is particularly appropriate.'") (quoting *Riegel Power Corp. v. Voith Hydro*, 888 F.2d 1043, 1046 (4th Cir. 1989)). And courts—including this Court—will apply contractual limitations on consequential damages to

47

both contract and tort claims arising between the parties. *See, e.g., Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 278 (4th Cir. 1987) ("There is no reason . . . why the parties cannot limit the recovery of consequential or special damages in negligence claims as well as in warranty."); *Schrier v. Beltway Alarm Co.*, 533 A.2d 1316 (Md. Ct. Spec. App. 1987) (holding that contractual limitation of damages provision applied both to contract and personal-injury claims between parties), *abrogated on other grounds*, *Wolf v. Ford*, 644 A.2d at 527 (adopting different test for public-policy exception to enforcing such limitations).

As the Maryland Court of Appeals explained in *Wolf*, "the public policy of freedom of contract is best served by enforcing the provisions of the clause." 644 A.2d at 525. Thus, "if the parties to a contract determine that one party will bear the burden of the other party's simple negligence, they are entitled to do just that." *Id.* at 528.[20]

---

[20] There are exceptions to this rule in circumstances involving: (1) intentional harms or gross negligence; (2) grossly unequal bargaining power; and (3) transactions affecting the public interest. *Wolf*, 644 A.2d at 525-26. None of those exceptions apply here.

The present case involves a contract between two large and sophisticated corporations.[21]  Maryland law allows such parties the contractual freedom to limit consequential damages.  Because this case was governed by an enforceable limitation on consequential damages, the District Court erred in allowing RG Steel to recover such damages— whether in tort or in contract.  This Court thus should reduce the final judgment amount by $6,615,255, to $8,940,629.

## II.    The evidence was insufficient to support the District Court's awards for demurrage and changes in commercial terms.

An independently sufficient reason for reducing damages is RG Steel's failure to present competent evidence on its claims for incremental demurrage and changes in commercial terms.[22]  RG Steel's expert in these areas, Jeffrey Cohen, lacked relevant experience, his

---

[21] Moreover, the party whose damages are to be limited (RG Steel) is the successor-in-interest to the drafters of the limitation on consequential damages (ArcelorMittal and Severstal).  RG Steel should not be heard to complain about the effect of its *own language*.

[22] The Court need not reach this issue if it finds that the Purchase Order's exclusion of consequential damages barred RG Steel's claims for demurrage and changes to commercial terms.

analysis ignored relevant variables, and his damages calculations

hinged on inadequate data and unwarranted assumptions.

### A.    Standard of Review

This Court reviews a district court's decision to allow expert

testimony for abuse of discretion. *Cooper v. Smith & Nephew, Inc.*, 259

F.3d 194, 200 (4th Cir. 2001). Whether or not evidence is sufficient to

support a claim for a category of damages presents a question of law

that this Court reviews de novo. *F.T.C. v. Ross*, 743 F.3d at 894.

### B.    Cohen should not have been allowed to opine on damages because he lacked relevant experience.

As a threshold matter, the District Court abused its discretion in

allowing Cohen to testify on damages issues.  The damage issues that

Cohen addressed included: (1) the computation of the additional

demurrage attributable to the accident, and (2) the computation of costs

due to changes in commercial terms resulting from the accident.[23]  Both

classes of damages relate to RG Steel's contention that the accident

---

[23] As noted above, the District Court rejected Cohen's analysis of
incremental handling and degradation expenses.  And Kinder Morgan is
not appealing the District Court's ruling on the Bridge Crane's
replacement value.  So the analysis here will focus on Cohen's
competency to evaluate demurrage and changes to commercial terms.

caused an increase in unloading time.  Cohen had no relevant experience in analyzing either issue.

"Demurrage" is a term in maritime law denoting "liquidated damages owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by the agreed time."  Black's Law Dictionary 463 (8th Ed. 2004).  RG Steel offered Cohen as an expert to show that, as a result of the accident, RG Steel incurred more demurrage costs than it otherwise would have (or, as Cohen put it, that RG Steel suffered "incremental demurrage" expenses).

During voir dire, however, Cohen conceded that he had never analyzed a demurrage claim before:

> Q.   Prior to this case, had you ever analyzed a demurrage claim.
>
> A.   No.

(III:79.)  Indeed, Cohen admitted that he had never even heard the term "demurrage" before being retained for this case:

> Q.   Have you ever—prior to this case, had you ever heard of demurrage?
>
> A.   No.

(*Id.*)  Although Cohen may be an expert in other fields of economics, he knew nothing about computing demurrage damages.

As for the changes in commercial terms, there was no evidence that Cohen had any experience in analyzing maritime contracts or the provisions in them governing unloading rates. Indeed, Cohen admitted that he was learning about these issues as he went along: "I actually am learning about these terms and learning about the shipping industry and wanted to know why wouldn't you just pay demurrage." (III:104.) He later acknowledged that he had no experience dealing with contracts relating to the shipment of coal or coke. (III:128.) When it came to analyzing damages resulting from alleged changes to commercial terms, Cohen was a neophyte, not an expert.[24]

Kinder Morgan objected to Cohen's testimony on the ground that he lacked the necessary experience to opine on these subjects. (III:81). The District Court overruled this objection and qualified Cohen as an "economics expert." (*Id.*). This was error.

Under Federal Rule of Evidence 702, a witness may offer expert opinion only where he "is qualified as an expert by knowledge, skill,

---

[24] And, as noted *infra* at 69, he was given only two contracts to analyze, out of the dozens of contracts at the time. So even if he had expertise in maritime contracts—which he did not—he lacked a factual foundation to ground his conclusions.

52

experience, training, or education." Fed. R. Evid. 702(a). A district court should exclude expert testimony where, as here, the expert lacks experience in the relevant field. *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989) (holding that district court abused its discretion by allowing testimony of expert witness who lacked experience in the financial issues involved in case); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (holding that an expert needed to apply "specialized knowledge," not just "general engineering principles" in analyzing products-liability issue). The fact that a witness has expertise in one field does not ipso facto mean that the expert has expertise in a related field. *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1296 (4th Cir. 1995) (witness's experience in designing a sledding hill did not make him an expert in snowmaking equipment).

In the present case, the District Court should not have allowed Cohen to testify about demurrage and changes to commercial terms. Although Cohen—an MBA, not a Ph.D. in economics—may have experience in such areas as antitrust, tax, and intellectual property, (III:76-77), he lacked the qualifications to offer helpful testimony about how to estimate the demurrage attributable to the accident. And he

53

lacked the qualifications to state what effect, if any, an increase in unloading time would have had on the terms of contracts for coke.  By his own admission, he was a newcomer to these fields.  A witness's expertise cannot be established by on-the-job training in the very case in which he is to offer expert testimony.  The District Court abused its discretion in allowing Cohen to testify on these issues.

### C.    Cohen failed to consider other factors that may have affected demurrage.

Even *with* Cohen's testimony, however, RG Steel lacked sufficient evidence to support an award for demurrage and changes to commercial terms.  Take, first, the claim for incremental demurrage.  In the District Court, Kinder Morgan acknowledged that the accident resulted in demurrage charges from the two coke ships that were scheduled to unload at the A Yard wharf during June and July 2008.  These charges amounted to $416,755.

RG Steel, however, claimed demurrage of $2,734,182.  The accident necessitated that coke ships unload at a different location, the "New Ore Pier."  (Op. at 15.)  This, RG Steel claimed, caused delays for other, non-coke, ships unloading at that pier.  (II:34-35.)  Thus, it argued, Kinder Morgan should have to pay for the increased demurrage

54

for those other ships.  RG Steel offered Cohen's testimony to quantify how much of the increased demurrage incurred by those other ships was due to the accident.

To do this, Cohen first computed a "baseline" demurrage-per-ton figure—i.e., he estimated how much demurrage RG Steel was likely to have incurred even in the absence of a major incident like a crane collapse.  (III:85.)  To arrive at this figure, he used data from the months immediately preceding the crane collapse.  (*Id.*)  Doing so, Cohen arrived at a figure of $0.34 per ton.  (*Id.*)  He then computed a demurrage-per-ton figure for June and July 2008, which he found was $2.71 per ton.  (III:86.)  Subtracting the baseline from this figure, he arrived at an "incremental demurrage" figure of $2.38 per ton.  (*Id.*)  Multiplying this per-ton amount by the actual tonnage unloaded in June and July, Cohen arrived at a total "incremental demurrage" cost of $2.7 million—i.e., his testimony was that the accident caused $2.7 million in additional demurrage costs during this period.  (*Id.*)  (PX 151 "Supplemental Exhibit II.xlsx".)

During cross examination, however, Cohen conceded that he did not examine potential alternate causes for the increase in demurrage.

55

Although the actual demurrage terms may have varied substantially between the particular contracts governing the ships unloading at the time, Cohen did not examine those contracts. (III:139.) Nor did he examine ships' logs to determine whether the delays were caused by problems unrelated to the Bridge Crane collapse (e.g, problems with shore-side equipment, delays in tugs, problems with the ships, labor shortages, scheduling issues, etc.). (III:140.) Likewise, he did not examine whether the discharges were into trucks, or whether the discharge rate was affected by the nature of the cargo being unloaded. (III:141.) And he did not take note of whether the cargos were on consignment, what the actual discharge rates of the cargos were, the configuration of the buckets and hatches used, etc. (III:141-42.) These factors could have significantly affected the amount of demurrage charges.

In both tort and contract actions, a party seeking to recover for a class of damages must establish those damages to a "reasonable certainty." *See Dehn v. Edgecombe*, 834 A.2d 146, 158 (Md. Ct. Spec. App. 2003) ("[A] plaintiff may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the

natural, proximate and direct effect of the tortious misconduct"); *Hoang v. Hewitt Ave. Assocs., LLC*, 936 A.2d 915, 934 (Md. Ct. Spec. App. 2007) (holding that non-breaching party in contract case "may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty").

A party fails to establish damages to a reasonable certainty where it relies on expert testimony that fails to account for other factors that might have contributed to the damages. *See, e.g.*, *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."); *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 276-77 (4th Cir. 1995) (holding in ADEA case that statistical evidence that omitted any discussion of the pool of job applicants—which would have affected average age of hired employees—did not establish pretext); *Oglesby*, 190 F.3d at 250 (rejecting expert testimony because the expert "could not eliminate other equally plausible causes" for failure of plastic part attaching

radiator hose on pickup-truck).  *See also Consolidated Rail Corp. v. Lansdale Warehouse Co., Inc.*, Civ. No. 89-8085, 1990 WL 63743, *9 (E.D. Pa. May 8, 1990) (holding, in rail demurrage context, that "Conrail has failed to provide the court with a reasonable basis upon which the court could make a proper determination and award of the demurrage charges that may be owing to Conrail").

In the present case, Cohen's testimony utterly failed to account for factors that could have affected his demurrage computation.  Cohen rationalized his failure to look into these alternate causes by stating that "it's safe to assume that the differences we see is because of the bridge collapse."  (III:138.)  Later, Cohen said he "was satisfied that one could safely attribute the difference to the bridge collapse."  (III:140.)  When pressed further to explain the source of this confidence, however, Cohen stated that one could just "suppose" that these factors would have affected demurrage the same before and after the accident:

> A.   I didn't [consider other risk factors].  But as a common metric matter, you would have suppose [sic] these things affect the one period and into the other.  If there was delay that was caused, for example, a lack of tugs, if that condition exists before and after, then it doesn't affect the results.

> Q.   What if it exists as a one-time only or an occasional phenomenon that occurs from time to time?
>
> A.   The short answer is that it may affect it, but I didn't see any evidence that it did.

(III:140-41.)  But as Cohen's testimony makes clear, the reason that he "didn't see any evidence" that other factors caused the increase in demurrage was that he never investigated those factors in the first place.  A damages expert does not rule out potential alternate causes by ignoring them.

In its opinion, however, the District Court relied on Cohen's statement that it was "safe to assume that the differences we see is because of the bridge collapse" and claimed that Cohen's account provided a "satisfactory measure of damages." (Op. at 34.)  This was error.  Cohen's analysis was patently circular.  He justified his neglect of alternate potential causes by assuming that those other factors were constant before and after the accident: "you would have suppose [sic] these things affect the one period and into the other. . . . [I]f that condition exists before and after, then it doesn't affect the results." (III:140-41.)  But this assumption is justified only if one already presupposes that the sole factor causing the increase in demurrage was

the Bridge Crane collapse.  Otherwise, one would have to identify and eliminate other potential significant causes for the demurrage spike. Yet Cohen could *not* just assume, as he did, that the accident caused the incremental demurrage, as that was the very proposition for which RG Steel offered his testimony.  In short, Cohen reached the conclusion that the accident caused the increased demurrage only by first assuming that the accident caused the increased demurrage.

The true basis for Cohen's conclusion that the entire increase in demurrage must be attributable to the accident appears to be that demurrage charges increased after the accident.  His testimony suggests as much:

> I think probably one of the most telling results in this demurrage analysis is that—it is a pretty big difference between the rate before and after on a per ton basis.

(III:141.)  But *post hoc ergo propter hoc* is a logical fallacy, not a sound methodology for computing damages.  Accordingly, Cohen's testimony did not afford the District Court a reasonably certain basis upon which to estimate demurrage damages.

The District Court's second rationale for accepting Cohen's damages figure was that "it cannot seriously be disputed that the

offloading of other ships was impacted in some way by the congestion and movement of coke ships to non-coke piers." (Op. at 34.) Given this proposition, the District Court concluded that "Mr. Cohen's proffered damages figure is an accurate representation of damages." (*Id.*)

This is a non-sequitur. Even if the offloading of coke ships at the non-coke pier affected the unloading of non-coke ships to some degree, it does not follow that it affected it to the degree that Cohen stated. RG Steel bears the burden of establishing demurrage damages to a reasonable degree of certainty. And in doing so, its expert must consider and exclude other factors that could have caused an increase in demurrage. Merely finding that the accident probably caused *some* demurrage did not license the District Court to attribute *all* of the incremental demurrage charges to the accident. Yet that is what the District Court did. Because RG Steel failed to establish its demurrage damages to the requisite degree of reasonable certainty, the District Court should have limited this category of damages to the conceded amount of $416,755.

### D. In analyzing changes to commercial terms, Cohen relied on inadequate evidence and improperly assumed that coke price was a direct function of laytime.

The District Court's analysis of the alleged changes in commercial terms suffers from similar flaws. At trial, RG Steel contended that the accident reduced its unloading speed, which it claimed would be reflected in an increase in contractual unloading times for ships—what is known as "laytime." *See* Black's Law Dictionary 906 (8th Ed. 2004) (defining "laytime" as "[t]ime allowed by a voyage charterparty for the charterer to load or unload cargo."). RG Steel claimed that this increased laytime caused increased shipping costs. Because the cost of coke includes shipping costs, RG Steel reasoned that the increase in contractual laytime caused a commensurate increase in how much it had to pay for coke.

To quantify this increase in cost, RG Steel once again presented the testimony of Jeffrey Cohen, who had no experience in maritime contracts. In his analysis, Cohen first computed how much additional laytime was attributable to the crane collapse. He estimated 87.86 days. To arrive at his 87.86-day figure, Cohen divided the total tonnage

unloaded by the supposed contractual unloading rate during the post collapse period (i.e., 5000 tons/day).  (III:102-05; PX 151, "Supplemental Exhibit VI.xlsx")  This gave him an estimate of the unloading time under the post-accident contracts:  234.29 days.[25]  (PX 151, "Supplemental Exhibit VI.xlsx")  Cohen then subtracted the time he computed it would have taken RG steel to have unloaded at the supposed pre-collapse contractual unloading rate (i.e., at 8000 tons/day).  (*Id*.)  This was 146.34 days.[26]  (*Id*.)  Doing so yields an 87.86-day value for the increase in contractual laytime.[27]  (*Id.;* III:102-05.)  To convert that purported 87.86-day increase in contractual laytime into a dollar figure, Cohen multiplied it by the average daily leasing rate for a "Panamax" ship[28] for the relevant period.  (PX 151, "Supplemental

---

[25] This is a sum of the row labeled "Days to Unload at Post-Collapse Rate."

[26] This is a sum of the row labeled "Days to Unload at Baseline Rate."

[27] This is the difference of the two figures, and also the sum of the row labeled "Incremental Days Required due to Collapse."

[28] A Panamax ship is a ship that is the maximum size to transit the Panama Canal.

Exhibit VI.xlsx") This gave him a total figure of $1,526,104. (*Id.*;

III:102-05.)

During cross examination, however, Cohen conceded that he only

reviewed two contracts selected by RG Steel—one pre-accident, one

post-accident—in making his assessment. This, even though a number

of other contracts showed no such changes in commercial terms during

the relevant time. (*See, e.g.*, DX 47, 50, 51, 52, 53, 54.) Cohen defended

this small sample size on the ground that the only reason he had

reviewed the contracts was to confirm that the contractual discharge

rates changed before and after the accident: "I was looking at these

contracts for changes in the rates at which they would contract to

unload." III:144-45. But he did not verify whether allowable discharge

rates (and thus laytime) changed across all—or even most—contracts

during the relevant period. The single pre-accident and post-accident

contracts that he examined could have been outliers. Without the

additional data, his analysis was just guesswork, not competent

evidence. *See Levy v. Lexington County*, 589 F.3d 708, 719 (4th Cir.

2009) (rejecting report of expert statistician where statistician merely

"eyeballed" a chart to identify outliers); *Vaughan v. MetraHealth Cos.*,

145 F.3d 197, 203-03 (4th Cir. 1998) (noting in ADEA case that "[w]e have repeatedly noted that statistical evidence is inherently malleable and that it is thus subject to careful scrutiny" and rejecting report that was based on a sample of only seven employees).

Cohen's analysis also failed to address other potential causes for changes in commercial terms. He did not, for example, consider market fluctuations in coke prices. Nor did he consider the fact that Severstal's and RG Steel's poor credit in the post-accident period may have affected contract terms. Cohen's failure to address these other potential causes for changes in commercial terms rendered his analysis useless. Indeed, the evidence showed that on some post-accident contracts, Severstal and RG Steel actually paid the same or less for coke than it did during the pre-accident period. (III:149-51; DX 47, 50, 51, 52, 53, 54.)

Finally, Cohen's analysis was predicated on the assumption that coke price was a direct function of discharge rate, and could be gauged simply by looking at daily rates for Panamax ships. (III:105.) But there was no evidentiary foundation for this assumption. Cohen admitted that he lacked any experience with shipping contracts for coke, and so could not establish this fact himself. (III:104, 128.) And there was no

other evidence that this was an accepted or reasonable methodology for estimating the costs—if any—attributable to increased laytime in maritime contracts.

The District Court, however, largely accepted Cohen's analysis of the alleged damages for changes in commercial terms.[29] It did not respond directly to Kinder Morgan's argument that the use of only two contracts, hand-picked by RG Steel, rendered his analysis statistically meaningless. As for the argument regarding alternate causes for the changes in commercial terms, the District Court attempted to turn the tables and shift the burden on Kinder Morgan to rule out alternate causes. Thus, it stated:

> [M]any variables factor into the purchase price of coke, including market conditions and the creditworthiness of the buyer. Kinder Morgan offered no evidence suggesting that those other factors remained constant before and after the Bridge Crane collapse, but its argument that similar prices undercut RG Steel's loss necessarily relies on that assumption.

---

[29] As noted *supra*, at 24, the District Court disallowed this category of damages for August 2011 and later, when unloading capacity had returned to normal. (Op. 43.)

66

(Op. at 41-42.)  This was error.  RG Steel was the plaintiff.  So RG Steel bore the burden of proving damages to a reasonable degree of certainty. *Brock Bridge Ltd. P'ship, Inc. v. Dev. Facilitators, Inc.*, 689 A.2d 622, 628-29 (Md. Ct. Spec. App. 1997) (holding that plaintiff bears burden of establishing damages amount).  Kinder Morgan did not bear the burden of *disproving* them.  Without knowing how those other variables affected commercial terms, it was impossible to determine whether—or to what extent—the decrease in average contractual discharge rate (assuming there was one) affected RG Steel's commercial terms.  Given this lack of evidence, the District Court should have rejected this category of damages altogether.

Instead, the District Court concluded that it was "implausible that RG Steel would pay exactly the same amount whether the vessel was rented for 19 or for 31 days, especially considering the high fees charged for demurrage."  (Op. at 42.)  And it awarded most of the claimed damages.[30]  (Op. at 44.)  Basically, the District Court reasoned that

---

[30] As noted above, it excluded such damages for the period after mid-2011, when Kinder Morgan installed a new Gottwald crane in the A Yard, which resulted in a discharge rate that was "on par with the Bridge Crane's discharge rates."  (Op. at 42.)

because it was reasonable to assume that the slower unloading rates adversely affected RG Steel's commercial terms, RG Steel must have suffered the damages claimed by Cohen. As in the demurrage context, this is a non-sequitur. Even if the slower contractual discharge rate affected commercial terms to some degree, it does not follow that it affected it to the degree that Cohen stated. A plaintiff must do more than show that it was harmed; it must give the factfinder a reasonable basis for quantifying damages. The evidence that RG Steel offered did not meet this standard and was insufficient as a matter of law to support a finding of over $1 million for this category of damages.

## CONCLUSION AND REQUEST FOR ORAL ARGUMENT

The District Court erred in allowing an implied contract to trump an express contract. It erred in not applying a valid and enforceable consequential-damages limitation. And it erred in basing its award of consequential damages on the incompetent and legally insufficient expert testimony of Jeffrey Cohen.

WHEREFORE, Kinder Morgan respectfully requests that this Court reverse the District Court's finding of breach of contract and remand with instructions that judgment on RG Steel's tort claim be

reduced by $6,615,255.  Kinder Morgan further asks that it be allowed

to present its arguments orally to this Court.

By:  /s/ Joseph M. Rainsbury

Of Counsel

Thomas M. Wolf  (Va. Bar. 18234)
LeClairRyan, a Professional Corporation
951 East Byrd Street, 8th Floor
Richmond, Virginia 23219
Telephone: (804) 916-7143
Facsimile: (804) 916-7243
thomas.wolf@leclairryan.com

Joseph M. Rainsbury (Va. Bar 45782)
LeClairRyan, a Professional Corporation
1800 Wells Fargo Tower
Suite 1200
Roanoke, Virginia 24006
Telephone: (540) 510-3055
Facsimile: (540) 510-3050
joseph.rainsbury@leclairryan.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)

1.    This brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because it contains 13,398 words, excluding the

parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.

32(a)(6) because it has been prepared in a proportionally spaced

typeface (Century Schoolbook) using Microsoft Word 2010 in 14-point

font.


    /s/ Joseph M. Rainsbury

## CERTIFICATE OF SERVICE

I certify that on June 30, 2014, the foregoing document was served

on all parties or their counsel of record through the CM/ECF system.


       /s/ Joseph M. Rainsbury