RECORD NO. 14-1245

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

RG STEEL SPARROWS POINT, LLC,
f/k/a Severstal Sparrows Point, LLC,

*Plaintiff-Appellee,*

v.

# KINDER MORGAN BULK TERMINALS, INC.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

### PAGE-PROOF RESPONSE BRIEF OF APPELLEE

Denise A. Lazar
BARNES & THORNBURG, LLP
Suite 4400
One North Wacker Drive
Chicago, IL 60606-2809
(312) 214-4816 Telephone
denise.lazar@btlaw.com

L. Rachel Lerman
BARNES & THORNBURG, LLP
Suite 300
2029 Century Park East
Los Angeles, CA 90067
(310) 284-3871 Telephone
rachel.lerman@btlaw.com

Linda S. Woolf
GOODELL DEVRIES
 LEECH & DANN, LLP
20th Floor
One South Street
Baltimore, MD 21202
(410) 783-4011 Telephone
lsw@gdldlaw.com

*Counsel for Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1245__    Caption: __RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__RG Steel Sparrows Point, LLC, f/k/a Severstal Sparrows Point, LLC__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.  Does party/amicus have any parent corporations?  ☑ YES ☐ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
    RG Steel, LLC


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
   If yes, identify any trustee and the members of any creditors' committee:

Signature: _Linda S. Wood_    Date: ___4/3/2014___

Counsel for: _RG Steel Sparrows Point, LLC_

## CERTIFICATE OF SERVICE
****************************

I certify that on ___4/3/2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Michael G. Chalos
Eugene J. O'Connor
Chalos O'Connor LLP
366 Main St.
Port Washington, NY 11050
(516) 767-3600
Email: mchalos@codus-law.com
Email: oconnor@codus-law.com

J. Stephen Simms
John T. Ward
Simms Showers LLP
20 S. Charles Street, Suite 702
Baltimore, Maryland 21201
(410) 783-5795
Email: jssimms@simmsshowers.com
Email: jtward@simmsshowers.com

_Linda S. Wood_
(signature)

___4/3/2014___
(date)

- 2 -

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE

TABLE OF AUTHORITIES ............................................................iv

COUNTER-STATEMENT OF ISSUES .................................................. 1

COUNTER-STATEMENT OF FACTS
AND PROCEDURAL HISTORY ...................................................... 3

    A.   THE PARTIES. ........................................................ 3

    B.   THE BRIDGE CRANE ................................................. 4

    C.   THE LEASE. ........................................................ 5

    D.   INTERIM AGREEMENTS. ............................................ 7

    E.   PURCHASE ORDERS. ............................................... 9

    F.   THE LAWSUIT. .................................................... 11

    G.   THE DISTRICT COURT'S DECISION .............................. 12

        1.   Negligence. ................................................... 12

        2.   Breach of contract. ........................................... 13

        3.   Damages. ..................................................... 15

SUMMARY OF ARGUMENT ................................................... 17

ARGUMENT ................................................................ 20

STANDARD OF REVIEW ..................................................... 20

i

I.    THIS COURT SHOULD AFFIRM THE DISTRICT
      COURT'S AWARD OF DAMAGES PURSUANT TO
      THE LEASE, BASED ON THE UNDISPUTED
      FINDING THAT THE PARTIES HAD AN IMPLIED
      IN FACT CONTRACT TO ABIDE BY THE TERMS OF
      THE LEASE. .................................................................. 21

      A.    Substantial Evidence Establishes that the Parties
            Had an Implied in Fact Contract. ............................. 21

      B.    The Purchase Order Did Not Displace the Lease. .... 25

            1.    Neither *Caroline County* nor any Maryland
                  case supports Kinder Morgan's legal
                  argument that an express contract
                  supersedes an implied in fact contract. ........... 25

            2.    The out-of-state cases Kinder Morgan cites
                  are not binding, and are in any event
                  inapposite. ........................................................ 27

            3.    The purchase order did not cover the same
                  subject as the Lease. ......................................... 29

      C.    Neither the Purchase Order Nor AMUSA-100
            Relieve Kinder Morgan of Liability for the
            Damages at Issue Here. ............................................. 31

            1.    RG Steel sought and was awarded only
                  general damages. ................................................ 31

            2.    The AMUSA-100 itself expressly allows RG
                  Steel to recover the damages challenged by
                  Kinder Morgan. ................................................. 33

II.   IN THE ALTERNATIVE, THE DISTRICT COURT'S
      DECISION MAY BE AFFIRMED BASED ON
      KINDER MORGAN'S STATUS AS A HOLDOVER
      TENANT. ...................................................................... 37

III.   SUBSTANTIAL EVIDENCE SUPPORTS THE
       DISTRICT COURT'S AWARD OF DAMAGES FOR
       DEMURRAGE AND CHANGES IN COMMERCIAL
       TERMS. ................................................................ 42

       A.   The District Court Properly Exercised Its
            Discretion in Hearing the Testimony of RG Steel's
            Economics Expert. ...................................... 43

       B.   Substantial Evidence Supports the District
            Court's Calculation of Damages Incurred for
            Demurrage and Commercial Changes. ..................... 46

            1.   The amount of damages is a matter of
                 "reasonable inference." ...................................... 46

            2.   The District Court properly awarded RG
                 Steel $2,734,182 in demurrage damages.......... 48

            3.   The District Court properly awarded RG
                 Steel $1,064,507 for damages attributable to
                 commercial changes. ........................................ 51

            4.   The District Court properly applied the
                 burden of proof. ................................................ 53

CONCLUSION ....................................................... 56

CERTIFICATE OF COMPLIANCE .................................................... 57

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Address v. Millstone,*
   56 A.3d 323 (Md. 2012) *cert. denied*, 62 A.3d 731 (2013) ............... 22

*Alternatives  Unlimited, Inc. v. New Baltimore City Board of Sch.
Comm'rs,*
   843 A.2d 252 (Md. 2004) ............................................................ 22, 26

*Annapolis Fire & Marine Insurance Co. v. Rich,*
   212 A.2d 249 (Md. 1965) ................................................................. 38

*Bloomgarden v. Coyer,*
   479 F.2d 201 (D.C. Cir. 1973) ......................................................... 26

*Burson v. Simard,*
   35 A.3d 1154 (Md. 2012) .................................................................. 32

*CR-RSC Tower I, LLC v. RSC Tower I, LLC,*
   56 A.3d 170 (Md. 2012) ............................................................... 32, 33

*CSX Transport, Inc. v. Miller,*
   858 A.2d 1025 (Md. 2004) ........................................................... 44-45

*Colonial Pipeline Co. v. State Department of Assessments &
Taxation,*
   806 A.2d 648 (Md. 2002) ................................................................. 41

*Consolidated Gas, Electric Light & Power Co. v. Ryan,*
   169 A. 794 (Md. 1934) ..................................................................... 40

*Cooper v. Smith & Nephew, Inc.,*
   259 F.3d 194 (4th Cir. 2001) ...................................................... 47-48

iv

*County Comm'rs of Caroline County v. J. Roland Dashiell &*
*Sons, Inc.,*
    747 A.2d 600 (Md. 2000) ....................................................... 21, 25, 26

*Cramer v. Baugher,*
    100 A. 507 (Md. 1917) ...................................................... 38

*David Sloane, Inc. v. Stanley G. House & Assocs., Inc.,*
    532 A.2d 694 (Md. 1987) .................................................. 46

*Eastman Kodak Co. of New York v. Southern Photo Materials Co.,*
    273 U.S. 359 (1927) ........................................................ 47

*F.D.I.C. v. Bakkebo,*
    506 F.3d 286 (4th Cir. 2007) ........................................... 55

*F.T.C. v. Ross,*
    743 F.3d 886 (4th Cir. 2014) ................................ 20, 21, 37, 42

*Gostin v. Needle,*
    45 A.2d 772 (Md. 1946) .................................................. 40

*Henson v. Liggett Group, Inc.,*
    61 F.3d 270 (4th Cir. 1995) ........................................... 48

*Hoang v. Hewitt Avenue Associates, LLC,*
    936 A.2d 915 (Md. 2007) ................................................. 32

*Joffre v. Canada Dry, Inc.,*
    158 A.2d 631 (Md. 1960)þ ................................................ 46

*Kirby v. Chrysler Corp.,*
    554 F. Supp. 743 (D. Md. 1982) ....................................... 46

*Kruvant v. Dickerman,*
    305 A.2d 227 (Md. Ct. Spec. App. 1973) ........................... 54

*Kowell Ford, Inc. v. Doolan,*
    391 A.2d 840 (Md. 1978) .................................................... 55

*Mack v. AmerisourceBergen Drug Corp.,*
    671 F. Supp. 2d 706 (D. Md. 2009) .................................... 45

*Mogavero v. Silverstein,*
    790 A.2d 43 (Md. 2002) ............................................... 22, 26

*Moseman v. Cnty. Council of Prince George's Cnty.,*
    636 A.2d 499 (Md. 1994) .................................................. 55

*Northern Heel Corp. v. Compo Industrial, Inc.,*
    851 F.2d 456 (1st Cir. 1988)............................................. 44

*Oglesby v. General Motors Corp.,*
    190 F.3d 244 (4th Cir. 1999) ....................................... 44, 48

*Red Jacket Oil & Gas Co. v. United Fuel Gas Co.,*
    146 F.2d 645 (4th Cir. 1944) ............................................ 47

*Premier Automobile Services, Inc. v. Flanagan (In re Premier Automobile Services, Inc.),*
    492 F.3d 274 (4th Cir. 2007) ........................................... 37

*Slick v. Reinecker,*
    839 A.2d 784 (Md. Ct. Spec. App. 2003) .......................... 13

*Soft Stuff Distribs. v. Ryder Truck Rental, Inc.,*
    2012 WL 3111679 (D. MD) .............................................. 28

*Stanley v. Hejirika,*
    134 F.3d 629 (4th Cir. 1998) ........................................... 21

*Straley v. Osborne,*
    278 A.2d 64 (Md. 1971) ........................................ 38, 40-41

*Thomas v. Capital Medical Management Associate, LLC,*
　　985 A.2d 51 (Md. Ct. Spec. App. 2009) ............................................. 46

*United States v. Whorley,*
　　550 F.3d 326 (4th Cir. 2008) ............................................................. 21

*Watts v. Columbia Artists Management Inc.,*
　　591 N.Y.S.2d 234 (1992) .................................................................... 27

*Westberry v. Gislaved Gummi AB,*
　　178 F.3d 257 (4th Cir.1999) ............................................................. 45

*White Construction Co., Inc. v. Martin Marietta Materials, Inc.,*
　　633 F. Supp. 2d 1302 (M.D. Fla. 2009) ............................................ 28

*Winslow Elevator & Machine Co. v. Hoffman,*
　　69 A. 394 (Md. 1908) ......................................................................... 32

## STATUTES & RULES

29 C.F.R. §1910.179(b)(4) .................................................................... 5, 36

29 C.F.R. § 1917.45(g)(4)(ii)(B), (5) ......................................................... 5

Md. Code Ann. Real Prop. § 8-402(c) ................................................. 37, 40

## COUNTER-STATEMENT OF ISSUES

Appellee RG Steel Sparrows Point, LLC ("RG Steel") owned the Sparrows Point steel mill and shipyard in Baltimore County, Maryland ("Sparrows Point").  Appellant Kinder Morgan Bulk Terminal Services, Inc. ("Kinder Morgan") conducted stevedoring and other business there under a lease and services agreement it entered in 1992.   The Lease included the terms for Kinder Morgan's occupation of land at Sparrows Point and its rights and obligations with respect to the mill's bridge crane, a massive piece of equipment used to unload coke and other materials from cargo ships.  Under the Lease, Kinder Morgan was liable for any damage to the crane, which was destroyed through its negligence.  RG Steel was awarded damages totaling $15,555,884.

Kinder Morgan does not dispute that its negligence caused the destruction of the crane or contest the bulk of the award.  Instead, it argues that approximately $6.5 million was awarded for "consequential" damages, which it contends it should not have to pay.  In the alternative, it argues that some $3.8 million of these "consequential" damages should be rejected because it disagrees with the District Court's evidentiary findings.  The issues on appeal are:

1

1.    Whether the District Court properly awarded RG Steel damages that Kinder Morgan characterizes as "consequential," because (a) there is ample support for the Court's factual determination that Kinder Morgan breached the parties' implied in fact agreement to abide by the terms of the Lease, which required Kinder Morgan, *inter alia*, to indemnify RG Steel for all damages caused by the destruction of the bridge crane; (b) there is no legal or factual support for Kinder Morgan's argument that the Lease was superseded by a purchase order; and (c) nothing in the purchase order prohibits RG Steel from recovering the challenged awards?

2.    In the alternative, whether the District Court's decision is supported as a matter of law by Kinder Morgan's status as a holdover tenant, *i.e.*, a tenant that remains on the property after its lease expires, because such a tenant remains subject to the terms of the expired lease?

3.    Whether the District Court properly exercised its discretion in admitting the testimony of RG Steel's economics expert?

4.    Whether substantial evidence supports the District Court's awards for demurrage and change in commercial terms?

2

## COUNTER-STATEMENT OF FACTS
## AND PROCEDURAL HISTORY

### A.     The Parties.

Plaintiff and appellee RG Steel acquired Sparrows Point in 2011 through a stock purchase agreement.  D. Ct. Findings of Fact and Conclusions of Law, Mar. 6, 2014, ECF No. 170 ("Op.") 1 n.1.  With the acquisition, RG Steel became the last in a long line of steel companies that owned and operated the mill after its long-time owner, Bethlehem Steel Corporation, sold the mill in bankruptcy in 2003.  Op. 7-8, n.6.[1]

Defendant and appellant Kinder Morgan advertises itself as the largest independent bulk terminal operator in North America. Plaintiff's Exhibit ("PTX") 3.  It has conducted business at Sparrows Point since 2002, when it acquired Chesapeake Bulk Stevedores, Inc. Op. 5 n.5.  Kinder Morgan's operations at Sparrows Point reaped substantial gross revenues – $24.5 million in 2009, $20.9 million in 2010, $18.9 million in 2011, and $15-16 million in 2012.  Trial Tr. 113:7-114:11, Nov. 21, 2013.

---

[1] RG Steel entered bankruptcy in 2012.  The mill is now closed. Op. 1 n.1.

### B.    The Bridge Crane.

In the 1950's, Bethlehem Steel, which then owned Sparrows Point, constructed a bridge crane on a portion of the mill known as the "A Yard," which includes the sole pier for unloading coke, a fragile material that must be handled with special care to keep it from crumbling.  Op. 4, 37-38.[2]

The bridge crane was a massive piece of equipment built to off-load bulk materials used for making steel, including coke and coal, from vessels and barges onto the "A" Yard, and to load other bulk materials, such as steel coils, from the "A" Yard onto the ships.  *Id.*; *see also* Stip. Facts ¶ 4; Betz Dep. 21:7-21:16, Apr. 16, 2010; Trial Tr. 6:18-7:2, Nov. 13, 2013, 156:25-157:3.  It was the "cornerstone" of Kinder Morgan's business at Sparrows Point.  PTX 5 at p. 1, Trial Tr. 87:6-16, Nov. 20, 2013.

The bridge crane was destroyed in June 2008 during a windstorm, thanks to Kinder Morgan's negligent failure to secure it properly with automatic rail clamps.  Op. 23-24.   After the accident, OSHA cited

---

[2] Sparrows Point includes a second pier, the New Ore Pier, used primarily for unloading iron ore, which is more robust than coke and is not as difficult to handle.  Trial Tr. 34:5-16, Nov. 13, 2013; Trial Tr. 70:4-10, Nov. 19, 2013.

4

Kinder Morgan for various safety violations, including failure to secure the bridge crane and failure to monitor the weather.  PTX 86, KM 000341-43; Trial Tr. 48:3-24, 50:1-7, Nov. 14, 2013; 29 C.F.R. § 1910.179(b)(4); 29 C.F.R. § 1917.45(g)(4)(ii)(B), (5); Trial Tr. 152:3-14, 160:15-161:6, 186:16-21, Nov. 13, 2013.

C.    **The Lease.**[3]

Bethlehem and Chesapeake entered the Lease in 1992 to provide for Chesapeake's occupation of some 26 acres of land at Sparrows Point (the "Leased Premises") and its use, operation, and maintenance of the bridge crane, several buildings, and other facilities.  Stip. Facts ¶ 28, 31-33; PTX 15 at KM 982-983; PTX 17 at SSP 2993-2994; Trial Tr. 88:5-13, Nov. 19, 2013.  Kinder Morgan acquired the Lease when it purchased Chesapeake in 2002.  Op. 5 n.5.  RG Steel acquired the Lease and other agreements with Kinder Morgan when it purchased Sparrows Point in 2011.  Defendant's Exhibit ("DTX") 11, § 2.12(b), Schedule 2.12(b)(ii)(12).

---

[3] The Court and parties used the term "Lease" or "1992 Lease" interchangeably to refer to the 1992 Second Amended Lease and Marine Terminal Services Agreement as subsequently amended.  Op. 2.

5

Among other things, the Lease provided for Kinder Morgan to occupy the Leased Premises, to maintain and insure the bridge crane, to pay the owner of Sparrows Point a "wharfage" fee for every net ton of material it transferred to or from cargo ships using the bridge crane, and to use the bridge crane for its own purposes, *i.e.*, to unload third party cargo.  Op. 9, 20; PTX 15, § 5.01(a)-(b), 5.03(b), § 12.01; Trial Tr. 90:13-91:1, Nov. 19, 2013.  The Lease also provided for Sparrows Point to pay Kinder Morgan for its stevedoring services, and set the terms for Kinder Morgan's rental of buildings and payment of utilities.   Op. 7; PTX 15, § 8.01 - 8.03; PTX 17, § V(3), (2).

Kinder Morgan "assume[d] the entire risk of loss, theft, or destruction of the Bridge Crane resulting from any cause whatsoever" under the Lease,  Op. 6; PTX 15,  § 12.01(e), and agreed to indemnify Sparrows Point "from and against all loss or liability for or on account of … damages received or sustained by [Kinder Morgan] … or [RG Steel] … by reason of any act or omission, whether negligent or otherwise, on the part of [Kinder Morgan][.]"  PTX 15, § 15.01; Trial Tr. 114:2-4, Nov. 19, 2013.  The parties agreed that the indemnity obligations would survive termination or expiration of the Lease.  PTX 15, § 18.01.

6

Kinder Morgan also agreed to perform certain tasks upon termination or expiration of the Lease, including return of the bridge crane and other equipment to Sparrows Point and payment for any damage or deterioration to the crane and other property.  PTX 15, §§ 12.01(i), 18.03.

### D.    Interim Agreements.

After the Lease was rejected in Bethlehem's bankruptcy proceeding, Kinder Morgan and International Steel Group, the company that replaced Bethlehem as owner of Sparrows Point, entered into a series of "Interim" and letter agreements expressly adopting all of the terms and conditions of the Lease.  Stip. Facts ¶ 36, PTX 24.  The last such agreement expired at the end of 2005.  Op. 8-9; Stip. Facts ¶¶ 37-40, 42; PTX 25, 26, 27, 28, 29.

When Severstal took over from International Steel, it requested an extension of the Interim Agreement, but a new agreement was never signed, most likely because Kinder Morgan wanted a long-term lease.  Op. 9; Trial Tr. 87:21-24, Nov. 19, 2013.

Kinder Morgan nevertheless continued to operate under the terms of what it referred to as the "existing" Lease.  It conducted business at

Sparrows Point and continuously occupied the Leased Premises until the mill closed in 2012 and after that. Trial Tr. 45:22-46:4, Nov. 12, 2013; PTX 40 at KM 56945; Trial Tr. 75:6-11, 88:5-23, Nov. 19, 2013; Trial Tr. 94:3-96:12, Nov. 20, 2013; PTX 15 at KM 982-983; PTX 17 at SSP 2993-2994. It also continued to pay wharfage fees and to honor the other terms of the Lease, *e.g.*, by making payments for rent and utilities. Op. 9; Trial Tr. 89:5-90:1, Nov. 20, 2013; PTX 52 (6/24/08 invoice showing wharfage charges); PTX 15, § 18.02. Sparrows Point, for its part, continued to pay Kinder Morgan for stevedoring services and permitted Kinder Morgan exclusive use of the bridge crane and "A" pier. Trial Tr. 25:1-14, Nov. 13, 2013; PTX 49.

Kinder Morgan never terminated the Lease or took any of the steps it was required to do at expiration or termination of the Lease. PTX 15, § 18.02 (KM 001006-07); Trial Tr. 20:7-17, 65:14-66:4, Nov. 13, 2013; Trial Tr. 88:5-89:1, Nov. 19, 2013; Trial Tr. 95:7-96:12, Nov. 20, 2013. Nor did it ever tell Sparrows Point that the Lease had expired or was terminated. Trial Tr. 65:14-66:4, Nov. 13, 2013; Trial Tr. 87:25-88:4, 97:9-12 , Nov. 19, 2013; Trial Tr. 96:13-97:1, Nov. 20, 2013. To the contrary, Kinder Morgan asked for a long-term extension of what it

8

termed the "existing" Lease, even after the crane was destroyed. Op. 9; PTX 37, 38, 39, 41, 42, 49; Trial Tr. 87:21-24, Nov. 19, 2013; Trial Tr. 65:14-66:4, Nov. 13, 2013.

Until the parties were "all lawyered up," in the words of Kinder Morgan's corporate representative, Trial Tr. 53:10-24, Nov. 19, 2013, Kinder Morgan continued to issue invoices affirming that it was providing services "per the terms and conditions of [the Lease]," PTX 49 at KM 005019. Kinder Morgan also continued to refer to the "existing" Lease in internal documents and in correspondence with Sparrows Point. PTX 40 at KM 56945; PTX 41, 42; Op. 10.

### E. Purchase Orders.

Bethlehem and subsequent owners used purchase orders – before and after the Lease expired – to track costs and pay vendors. Op. 7; Trial Tr. 54:15-20, 113:12-114:6, Nov. 13, 2013; Trial Tr. 94:5-17, Nov. 19, 2013. PTX 43; Trial Tr. 73:6-74:12, Nov. 20, 2013. Purchase orders were thus a vehicle to get Kinder Morgan paid and nothing more. Trial Tr. 54:15-20, Nov. 13, 2013. They co-existed with the Lease, which set the terms for Kinder Morgan's operations and presence at Sparrows Point. PTX 43.

9

Sparrows Point would send Kinder Morgan purchase orders for stevedoring or other services and Kinder Morgan would respond by sending invoices to Sparrows Point.  Op. 7 (citing PTX 43, Trial Tr. 93-94, Nov. 19, 2013, Trial Tr. 73-74, Nov. 20, 2013).  Some of these invoices, including one signed by Kinder Morgan in response to a purchase order in effect at the time of the accident, referred expressly to the terms and conditions of the Lease.  PTX 49.

Other invoices refer to the "AMUSA-100," which is a list of "General Purchasing Conditions" "for Purchase Orders," *e.g.*, for delivery of payment, invoicing, and delivery and inspection of goods, etc., issued by Severstal, the company that owned Sparrows Point at the time of the bridge crane accident.  DTX 10.

Kinder Morgan points out that the AMUSA-100 provides that the parties are not liable for "consequential damages," but fails to add that "consequential damages" do not include "liabilities to which either party has expressly agreed under this order."  DTX 10, §7.6.  The parties agreed "under this order" that Kinder Morgan would accept "any liability with respect to any adverse effect arising from its action or

10

inaction with respect to quality, safety, security and the environment,"
DTX 10, § 3.4, including violation of OSHA requirements, DTX 10, § 3.6.

The AMUSA-100 also provides that: "specific terms agreed in
writing [between the parties] … shall prevail over … [the AMUSA-100]
provisions." DTX 10, §1.4.

## F.    The Lawsuit.

After the bridge crane was destroyed, Severstal sued Kinder
Morgan for loss of the crane, which had played an essential role in steel
production at Sparrows Point. D. Ct. Am. Compl., ECF No. 83.[4]  Among
other things, the loss of the bridge crane cut off access to the A Yard
pier, which was the only pier suited to unloading coke. Trial Tr. 14:6-
11, Nov. 13, 2013; Trial Tr. 119:11-17, Nov. 13, 2013. As a result,
Sparrows Point had to resort to costly alternatives for unloading,
stacking, and storing coke. Op. 32-46.

Over the course of a seven-day bench trial, RG Steel presented
evidence that the bridge crane was lost due to Kinder Morgan's
negligence, and requested damages arising from its loss, consistent with
general negligence law and the Lease's indemnity provision in favor of

---

[4] RG Steel replaced Severstal as plaintiff when it acquired
Sparrows Point. Op. 1 n.1.

RG Steel.  Kinder Morgan denied any negligence, and argued that, because the Lease had expired, the operative contract was one of the purchase orders in effect the day of the accident, including the AMUSA-100, to which it referred.  According to Kinder Morgan, the provisions of the AMUSA-100 released it from liability for what it termed "consequential" damages.[5]

### G.     The District Court's Decision.

After the bench trial, the District Court issued a 47-page opinion in favor of RG Steel.

#### 1.     Negligence.

The District Court concluded that Kinder Morgan's negligent failure to secure the crane against the wind with automatic rail clamps caused the crane's destruction, a finding that is not disputed on appeal. Op. 23-27.  The finding of negligence was separate from the findings under RG Steel's breach of contract claim.

---

[5] The District Court did not address the argument that any portions of RG Steel's damages were "consequential" because it found that Kinder Morgan was liable under the Lease as wells as in negligence for the damages proven at trial.

## 2.    Breach of contract.

The District Court found that the parties' conduct demonstrated that they had an implied in fact contract, *i.e.*, that the parties "intended and continued to operate pursuant to the 1992 Lease," even after it expired.  Op. 21; *see id*. at 18 (defining an implied in fact contract as one "that 'can be seen in [the] conduct [of the parties] rather than in an explicit set of words.'") (quoting *Slick v. Reinecker*, 839 A.2d 784, 794 (Md. Ct. Spec. App. 2003) (quotations omitted); *see generally* Op. 16-21.  "[T]he course of the parties' conduct belies any assertion by Kinder Morgan that it was not operating pursuant to the terms and conditions of the 1992 Lease."  *Id*. at 20.

Specifically, the Court found that "Kinder Morgan continued to operate, perform regular maintenance on, and conduct third party business with the Bridge Crane."  Op. 20.  Further, "Kinder Morgan continued to pay rent, utilities, and wharfage fees consistent with the terms of the Lease, and RG Steel and its predecessors in interest accepted those payments."  *Id*.

And Kinder Morgan "repeatedly referenced the [L]ease" in communications with Sparrows Point before and after the destruction of

13

the bridge crane, *id*. at 10, citing PTX 38 at KM 50052 (KM's letter seeking an "extension of  current 'A' Yard Lease and Terminaling Agreement"); Trial Tr. 105:6-9, Nov. 19, 2013 (KM's acknowledgement that the lease referred to was the 1992 Lease); PTX 49 at KM 005019 (KM's invoice dated February 18, 2008, referring to the 1992 Lease).

Finally, "Kinder Morgan never took any of the steps required by the 1992 [Lease] upon expiration" and "repeatedly referenced the 1992 Lease as if it was still in operation and effect, even subsequent to the Bridge Crane Collapse."  Op. 20-21.

The Court stated that "[i]t seems fairly clear" that Kinder Morgan was also subject to the Lease as a holdover tenant, since it continued to occupy the Leased Premises, but decided it need not reach the issue in light of its decision that the parties had an implied in fact agreement to abide by the Lease.  Op. 17-18, n.9.

The District Court rejected Kinder Morgan's argument that the AMUSA-100, which is referenced in the purchase orders in effect the day of the accident, superseded the Lease, because it "contains only generalized obligations relating to the provision of goods, and does not include any terms that can reasonably be construed as requiring Kinder

14

Morgan to perform maintenance on, or authorizing Kinder Morgan to use, the Bridge Crane." Op. 20. Indeed, the AMUSA-100 makes no mention of the bridge crane.

Kinder Morgan makes much of the Court's statement that "neither [the purchase orders nor the AMUSA-100] refers specifically to the Bridge Crane or any of the obligations Kinder Morgan continued to perform," Op. 20, when one of the purchase orders includes the words, "unloading up to 500,000 nton of coke from ships *with bridge crane*," Opening Brief of Appellant, June 30, 2014, ECF No. 27 ("KM Br.") at 35-36 (quoting PTX 45) (emphasis added). As discussed in the legal argument, *infra*, this detail constitutes, at most, harmless error, because it does not alter the Court's conclusion that the purchase orders were used simply as a vehicle to pay Kinder Morgan and vendors under the Lease before and after it expired and thus did not invalidate the Lease.

### 3. Damages.

RG Steel sought general damages for negligence and breach of contract, *i.e.*, damages arising directly from destruction of the bridge crane and Kinder Morgan's failure to restore the bridge crane or make

15

repairs after the accident.  RG Steel did not seek damages for lost profits or loss of business or revenue resulting from the accident.

The District Court awarded RG Steel the following:

1. $7,066,666 to replace the bridge crane and $1,873,963 for emergency repairs;

2. $2,734,182 for demurrage – *i.e.*, contracted charges RG Steel paid to ship owners when their vessels were delayed due to loss of the bridge crane;

3. $1,064,507 for changes in commercial terms reflecting the extra time needed to unload cargo without the bridge crane;

4. $2,055,429 for additional stevedoring charges incurred to transfer coke without the bridge crane; and

5. $761,137 for additional stacking or "hopper" charges incurred to stack coke without the bridge crane.

Kinder Morgan concedes it owes RG Steel $8,940,629 for replacement of the bridge crane and emergency repairs (although it has yet to pay any of these damages).  KM Br. 22 nn.10, 11.  Kinder Morgan disputes the remaining categories on the ground they are "consequential damages," which it contends it should not have to pay.

KM Br. 28-49. Kinder Morgan also argues that the amounts awarded for categories 2 and 3 above are not supported by substantial evidence. KM Br. 49-69. It makes no evidentiary argument with respect to the amounts awarded for categories 4 and 5, but fails to mention that these awards reflect the amounts ($2,055,429 and $761,137) that Kinder Morgan *conceded* at trial. Op. 35-37.

## SUMMARY OF ARGUMENT

1.    The District Court properly awarded RG Steel damages naturally arising from Kinder Morgan's negligence and failure to indemnify RG Steel for direct losses arising from the destruction of the bridge crane, as Kinder Morgan was required to do under the parties' implied in fact agreement to abide by the terms of the Lease and under general negligence law.

There is no legal or factual support for Kinder Morgan's argument that the Lease was superseded by one of the purchase orders in effect on the day of the accident or by the AMUSA-100, to which the purchase orders refer.

As a matter of law, Kinder Morgan concedes that there is no Maryland authority holding that an express agreement supersedes an

17

implied in fact agreement, even when they cover the same subject matter.

As a matter of fact, the District Court correctly found that the purchase order in effect on the date of the accident did not cover the same subject matter as the Lease and did not apply. Purchase orders were nothing new. The parties agreed they had used them to keep track of jobs and pay services since the Bethlehem days, when the Lease was created, through and after the time it expired. Accordingly, the Court found that neither the purchase order nor the AMUSA-100 to which it referred superseded the Lease, which was the only agreement covering Kinder Morgan's use of the Leased Premises and the bridge crane, and setting forth the rates at which Kinder Morgan would be paid for its operation of the bridge crane.

In any event, nothing in the AMUSA-100 prohibits the recovery of the damages challenged by Kinder Morgan on appeal. The damages sought by RG Steel and awarded by the District Court, were all general damages, *i.e.*, damages naturally arising from Kinder Morgan's negligence and failure to perform under the Lease, not consequential damages. Kinder Morgan's argument that the AMUSA-100 precludes

these damages is based on an incomplete and misleading recitation of the document terms.

2.    Even if this Court disagrees with the finding that there was an implied in fact contract, it should affirm the District Court's decision based on Kinder Morgan's status as a holdover tenant – *i.e.*, a tenant that stays on the property after expiration of the lease – and was thus required to abide by the terms of the Lease.

3.    The District Court's decision to admit the testimony of RG Steel's economics expert, Jeffrey Cohen, was well within its broad discretion.  The Court reasonably determined that Cohen did not require special expertise in the shipping industry to determine the amount of incremental damages incurred due to delays resulting from loss of the bridge crane, whether in the form of fees paid to the ship owners for keeping ships in port longer than anticipated, or contractual adjustments to account for the additional time needed to unload, transfer, and stack coke without the bridge crane.

4.    There is ample evidence to support the District Court's awards for demurrage and commercial changes.  The Court considered the expert's evidence along with the evidence of percipient witnesses,

including Sparrows Point's longtime controller and documentary evidence supplied by both parties. Kinder Morgan's argument that the Court should have rejected Cohen's testimony based on its counsel's argument is meritless. Kinder Morgan did not proffer any of its own expert testimony or any other evidence to support its argument that other factors could have been responsible for fees and costs incurred due to delay caused by the loss of the bridge crane.

## ARGUMENT

## STANDARD OF REVIEW

RG Steel agrees with Kinder Morgan that this Court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *F.T.C. v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014) (citations omitted) (cited in KM Br. at 28).

RG Steel does not agree, however, that this Court applies a *de novo* standard in determining whether there is sufficient evidence to support the district court's damages findings. *See* KM Br. 50 (citing *Ross*, 743 F.3d at 894). To the contrary, as *Ross* itself directs, a district court's factual findings are entitled to "even greater deference" than usual when (as here) they turn "on assessments of witness credibility or the weighing of conflicting evidence during a bench trial." *Id*. (citation

20

omitted); *see also Stanley v. Hejirika*, 134 F.3d 629, 633 (4th Cir. 1998) (clear error exists when this Court determines that, "the findings under review … are not supported by substantial evidence."); *United States v. Whorley*, 550 F.3d 326, 338 (4th Cir. 2008) ("substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support" the finding under review).

This Court may affirm the District Court's decision "on the basis of any ground supported by the record even if it is not the basis relied upon by the district court[.]" *Ross*, 743 F.3d at 893 (citation and internal quotations omitted).

## I.  THIS COURT SHOULD AFFIRM THE DISTRICT COURT'S AWARD OF DAMAGES PURSUANT TO THE LEASE, BASED ON ITS UNDISPUTED FINDING THAT THE PARTIES HAD AN IMPLIED IN FACT CONTRACT TO ABIDE BY THE TERMS OF THE LEASE.

### A.  Substantial Evidence Establishes that the Parties Had an Implied in Fact Contract.

The Maryland high court has recognized that "[a] contract implied in fact is one inferred from the circumstances or acts of the parties[.]" *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 606 (Md. 2000) (citations and quotations omitted)

("*Caroline County*").[6]  "An implied in fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'"  *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of Sch. Comm'rs*, 843 A.2d 252, 289 (Md. 2004) (quoting *Mogavero v. Silverstein*, 790 A.2d 43, 52 (Md. 2002)).  "A true implied contract, or contract implied in fact" describes the same legal relationship as an express contract; "only the mode of proof is different."  *Id.* (citations omitted).  It requires a meeting of the minds, "but objective assent is all that is required."  *Address v. Millstone*, 56 A.3d 323, 335 (Md. 2012) *cert. denied*, 62 A.3d 731 (2013) (citations and quotations omitted).

The District Court determined that the parties had an implied in fact agreement to abide by the terms of the Lease, based on their course of conduct.  As discussed *supra*, the Court found that, even after the Lease expired, "Kinder Morgan continued to operate, perform regular maintenance on, and conduct third party business with the Bridge Crane"; that "Kinder Morgan continued to pay rent, utilities, and

---

[6] The parties agree that the contract dispute is subject to Maryland law.  Stip. Facts ¶ 27; PTX 15, § 26.05.

wharfage fees consistent with the terms of the Lease, and RG Steel and its predecessors in interest accepted those payments"; that "Kinder Morgan never took any of the steps required by the 1992 Lease upon expiration" and "repeatedly referenced the 1992 Lease as if it was still in operation and effect, even subsequent to the Bridge Crane Collapse." Op. 20-21.

Kinder Morgan also continued to exclusively occupy the Leased Premises before and after the expiration of the Lease. Further, Kinder Morgan "repeatedly referenced the [L]ease" in communications with Sparrows Point before *and after* the destruction of the bridge crane. Op. 10 (citing PTX 38 at KM 50052 [letter from Kinder Morgan seeking an "extension of the current 'A' Yard Lease and Terminaling Agreement"]; Trial Tr. 105:6-9, Nov. 19, 2013 [Kinder Morgan's acknowledgement that the lease referred to was the 1992 Lease]; PTX 49 at KM 005019 [Kinder Morgan's invoice of February 18, 2008, referring to the 1992 Lease].

Given this implied in fact agreement to abide by the terms of the Lease even after it expired, Kinder Morgan assumed "the entire risk of loss, theft, or destruction of the Bridge Crane resulting from any cause

whatsoever," PTX 15, § 12.01(e) and agreed to indemnify Sparrows Point "from and against all loss or liability for or on account of … damages received or sustained by [Kinder Morgan] … or [RG Steel] … by reason of any act or omission, whether negligent or otherwise, on the part of [Kinder Morgan], PTX 15, § 15.01 – a provision that the parties agreed would apply before or after termination or expiration of the Lease, PTX 15, § 18.01.  Kinder Morgan breached the agreement by failing to cover the loss of the bridge crane.  Op. 21, 27.

Kinder Morgan does not deny that substantial evidence supports the District Court's finding that the parties had an implied in fact contract to abide by the terms of the Lease after it expired, through and after the time of the accident.  Instead, Kinder Morgan argues that it was not bound by the Lease because it was superseded by a purchase order and the AMUSA-100 terms covering the sale of goods and related services.  According to Kinder Morgan, the AMUSA-100 included a provision relieving it of liability for "consequential" damages.  KM Br. 45-46.  The District Court properly rejected these arguments.

**B.    The Purchase Order Did Not Displace the Lease.**

    **1.    Neither *Caroline County* nor any Maryland case supports Kinder Morgan's legal argument that an express contract supersedes an implied in fact contract.**

Kinder Morgan cites *Caroline County* for the proposition that, "[u]nder Maryland law, … a party may not maintain an action for an implied contract where, as here, an express agreement exists between the parties on the same subject matter."  KM Br. 37 (citing *Caroline County*, 747 A.2d at 608-09 n.8).

Kinder Morgan concedes three pages later, however, that *Caroline County* did not analyze an implied in fact contract, but rather an alleged *quasi-*, or implied in *law* contract, which the Court described as a "legal fiction invented … to permit recovery by contractual remedy when, in fact, there is no contract."  *Caroline County*, 747 A.2d at 606 (citation and alteration omitted).  Kinder Morgan also concedes that neither *Caroline County* nor any other Maryland authority holds that "the existence of an express contract defeats an implied-in-fact contract claim."  KM Br. 40.

In an effort to modify Maryland law to support its argument, Kinder Morgan disingenuously suggests that there is only a "slight[]"

difference between an implied in *fact* and an implied in *law* contract. KM Br. 40. The difference is anything but "slight," however, as *Caroline County* and other Maryland cases make clear.

*Caroline County* explains that, unlike implied in fact contracts, quasi-contracts are not "true contracts … [because they] "are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises." 747 A.2d at 606 (citation and footnote omitted); *see id.* at n.8 (citing, *inter alia*, *Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1973) (holding that a quasi-contract "is not really a contract," so "there is … no need to resort to [quasi-contract] when the evidence sustains the existence of a true contract, either express or implied in fact"); *see also Alternatives Unlimited*, 843 A.2d at 289 (holding that a contract implied in fact is a "true contract" that establishes the same legal relationship as an express contract); *Mogavero*, 790 A.2d at 52 (same).

In sum, there is no binding authority for Kinder Morgan's legal argument that an express contract supersedes an implied in fact agreement.

### 2.    The out-of-state cases Kinder Morgan cites are not binding, and are in any event inapposite.

Because "[t]here is no Maryland authority" to support its argument, KM Br. 40, Kinder Morgan relies on the law of "other jurisdictions" which, it claims, hold that an express contract trumps an implied in fact contract.  KM Br. 40-45, nn.16-18.  Cases involving out-of-state law are, of course, not precedential, and are irrelevant in light of Maryland law holding that implied in fact contracts are true contracts, just like express contracts.

In any event, the cases Kinder Morgan cites do not support its position.  For example, Kinder Morgan relies on *Watts v. Columbia Artists Mgmt. Inc.*, 591 N.Y.S.2d 234, 236 (1992), which it quotes as stating that "the theories of express contract and of contract implied in fact are mutually exclusive[.]"  KM Br. 42.  But the *Watts* court went on to explain that the theories are "mutually exclusive" not because they cannot co-exist, but because express contracts are interpreted as a matter of law, while the existence and terms of an implied in fact contract "involve factual issues regarding the intent of the parties and the surrounding circumstances."  *Watts*, 591 N.Y.S.2d at 236.  *Watts* did not discuss whether one form of contract trumps another, but merely

27

decided that the parties had an implied in fact agreement to abide by the terms of their expired written agreement.  *Id*. at 236-37.

Based on this and other inapposite cases,[7] Kinder Morgan invites this Court to find that one of the purchase orders in effect on the day of the accident and/or the AMUSA-100 to which it refers, supersede the Lease because they concern the "same subject."  KM Br. 41-44.  Even if there were controlling precedent for the theory that an express agreement supersedes an implied in fact agreement, however, and there is not, Kinder Morgan's argument is squarely refuted by the District Court's factual finding that the Lease and the purchase orders do not concern the "same subject," because they cover different aspects of the parties' relationship.

---

[7] Kinder Morgan cites a number of federal cases, KM Br. 42 n.18, but the quotes taken from these cases are merely dicta regarding the law governing government contracts (the Federal and Third Circuit decisions) or dicta regarding the law of Indiana and Illinois (the Seventh Circuit decisions).  Kinder Morgan also cites a Maryland district court case citing New York district court cases and another citing a Florida state case, KM Br. 40 n.16, but the Florida case concerns an implied in law, not an implied in fact, contract.  *White Constr. Co., Inc. v. Martin Marietta Materials, Inc.*, 633 F. Supp.2d 1302, 1334 (M.D. Fla. 2009), cited in *Soft Stuff Distribs. v. Ryder Truck Rental, Inc.*, 2012 WL 3111679, at *6 (D. Md. July 30, 2012).

### 3.   The purchase order did not cover the same subject as the Lease.

Both Kinder Morgan and RG Steel presented evidence that purchase orders were used dating back to the Bethlehem days.  Op. 7. The purchase orders were just perfunctory forms used to keep track of jobs and pay Kinder Morgan and various vendors.  *Id.*, Trial Tr. 54:15-20, Nov. 13, 2013.  They did not conflict with the Lease, which provided the overarching framework for the parties' relationship, nor did they supersede it before or after the Lease expired.  Op. 20-21.

The AMUSA-100 terms and conditions are simply a boilerplate list of conditions pertaining to purchase orders and invoices for "goods" and "services related to goods."  DTX 10.  Indeed, the limitation of liability on which Kinder Morgan relies is contained in the warranty of goods section of AMUSA-100.  DTX10 Section 7.

The District Court rejected Kinder Morgan's argument that the purchase order and/or AMUSA-100 somehow replaced the Lease, because (1) purchase orders were always used in conjunction with the Lease, (2) Kinder Morgan's own invoices continued to reference the Lease after it expired, and (3) neither the purchase orders nor the AMUSA-100 included "any of the obligations that Kinder Morgan

continued to perform." Op. 7, 20. "To the contrary, the AMUSA-100 contains only generalized obligations relating to the provision of goods, and does not include any terms that can reasonably be construed as requiring Kinder Morgan to perform maintenance on, or authorizing Kinder Morgan to use, the Bridge Crane." *Id*. at 20. And the AMUSA-100 itself contemplates that other agreements may apply and states that the purchase orders do not trump pre-existing agreements. DTX 10, § 1.4.

Unable to dispute these factual findings, Kinder Morgan is left to argue that the District Court "reversibly erred" by stating that the purchase order in effect on the day of the accident did not refer to the bridge crane, because another purchase order of the same date includes the words "with bridge crane." KM Br. 31 (citing DTX 9); *see* Op. 20, 11 (citing DTX 9, 9A). The mistake, if any, is so minor it hardly bears mention. It certainly is not prejudicial or reversible error.

The purchase order cited by Kinder Morgan (which follows the payment terms and amounts stated in the Lease) says nothing about the conditions for Kinder Morgan's use of the bridge crane, its duty to maintain the bridge crane, its presence and use of the Leased Premises,

or its sole access and control of the site where the coke was to be deposited and stacked.  As the District Court correctly found, those terms (among others detailing the relationship between the parties) are included in the Lease, and in the Lease alone.  Op. 20.

In sum, the District Court properly ruled that Kinder Morgan had agreed to abide by the liability and indemnity provisions (among others) to which it agreed under the Lease based on its factual finding that the parties had an implied in fact agreement to continue to abide by these terms.

## C.    Neither the Purchase Order Nor AMUSA-100 Relieve Kinder Morgan of Liability for the Damages at Issue Here.

### 1.    RG Steel sought and was awarded only general damages.

The District Court held that Kinder Morgan was liable for damages for negligence and breach of the Lease, "including but not limited to, its obligation to indemnify RG Steel for damages incurred." Op. 21, 27.  The Court did not characterize any of the damages it awarded as consequential, nor did RG Steel seek such damages.

Under Maryland law, damages for breach of contract fall into two main categories – general damages for the "value of the other party's

31

performance or [damages for] a consequential loss following from the breach." *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 182 (Md. 2012) (quotations omitted). *General* damages are traditionally described as "damages for the breach such as may fairly and reasonably be considered as arising naturally, *i.e.,* according to the usual course of things from such a breach of contract itself [,]" *Hoang v. Hewitt Ave. Associates, LLC*, 936 A.2d 915, 934 (Md. 2007) (quoting *Winslow Elevator & Mach. Co. v. Hoffman*, 69 A. 394, 396 (Md. 1908)), while *consequential* damages are described as those "such as may fairly and reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it." *Hoang*, 936 A.2d at 934 (quoting *Winslow Elevator*, 69 A. 394); *see also Burson v. Simard*, 35 A.3d 1154, 1159 (Md. 2012).

In this case, RG Steel did not seek damages for lost profits, loss of revenue resulting from the accident, or any other kind of consequential or special damages. Instead, RG Steel sought only general damages, *i.e.*, damages "arising naturally" from Kinder Morgan's breach of its agreement to operate and maintain the bridge crane,  assume the risk of harm to the bridge crane, PTX 15, § 12.01, and to indemnify RG Steel

"from and against all loss or liability for or on account of … damages received or sustained by [Kinder Morgan] … or [RG Steel] … by reason of any act or omission, whether negligent or otherwise, on the part of [Kinder Morgan], PTX 15, § 15.01.

Had Kinder Morgan performed on its promises, *i.e.*, by replacing the bridge crane with equipment capable of loading and transferring coke at the same rate, with the same degree of care and at the cost set forth in the Lease, RG Steel would not have incurred damages naturally arising from the loss of the bridge crane, including demurrage and other costs for delay in unloading ships and additional costs for stacking and transferring coke to remote areas of the yard. *CR-RSC Tower I*, 56 A.3d at 182.

Kinder Morgan's argument that it was not liable for "consequential" damages is thus simply unavailing as a matter of fact and law.

### 2. The AMUSA-100 itself expressly allows RG Steel to recover the damages challenged by Kinder Morgan.

Even assuming *arguendo* that the AMUSA-100 provisions applied, they would not preclude any of the damages awarded here. Kinder

Morgan's argument to the contrary is based on a truncated version of those provisions.

Kinder Morgan argues that the AMUSA-100 relieves it from liability for "consequential" damages based on the first portion of section 7.6, which provides that "in no event shall either party be liable to the other under this order for consequential, indirect or special damages, including without limitation lost profits, revenues, production or business (collectively 'consequential damages')[.]" KM Br. 45-46. Remarkably, however, Kinder Morgan fails to quote the rest of section 7.6, which expressly states that "consequential damages" shall *not* include "any obligations to defend, indemnify or hold harmless or other liabilities to which either party has expressly agreed under this order[.]" DTX 10, §7.6.

Even if the damages awarded could be viewed as consequential (notwithstanding Maryland law to the contrary), at least two provisions of the AMUSA-100 take the damages awarded here out of the category of "consequential damages" as defined in section 7.6. First, "[RG Steel's] rights and remedies as set out in these GPC shall be in addition to any rights and remedies provided by law." DTX 10, § 7.7. This

34

provision creates a right and remedy by negligence. Under the District Court's findings, Kinder Morgan is wholly liable for its negligence for all general damages awarded.

Second, the AMUSA-100 expressly provides that "specific terms agreed in writing with [Kinder Morgan], and any and all documents incorporated therein which may be in contradiction with these [General Terms], shall prevail over the corresponding General Terms provisions." DTX 10, §1.4. The specific indemnity and damages provisions in the Lease agreement – to which the parties agreed to abide – thus take damages arising from destruction of the crane out of the category of consequential damages under section 7.6.

Third, the AMUSA-100 includes a provision requiring Kinder Morgan to accept "any liability with respect to any adverse effect arising from its action or inaction with respect to quality, safety, security and the environment." DTX 10, § 3.4. The document incorporates by reference federal, state, and local laws, and all "rules and regulations pertaining to safety and health, including but not limited to [OSHA]." DTX 10, § 3.6(a).

One of Kinder Morgan's own executives conceded at trial that section 3.6 would apply if Kinder Morgan received a citation from OSHA. It is undisputed that Kinder Morgan did receive such a citation from OSHA following the collapse of the bridge crane. Trial Tr. 101:24-102:19, Nov. 19, 2013.

The District Court found that the bridge crane was destroyed as a result of Kinder Morgan's negligence in failing to secure it with automatic rail clamps, as required by OSHA's safety regulations. Op. 23-25. It is undisputed that Kinder Morgan failed to use automatic rail clamps and that this failure constituted a violation of OSHA standards. *Id.*; 29 C.F.R. 1910.179(b)(4).

Assuming for the sake of argument that the AMUSA-100 applies, then, Kinder Morgan is liable by negligence and by contract under sections 3.4, 3.6, 7.6 and 7.7 for all of the damages arising from loss of the bridge crane, even if this Court determines that the awards challenged by Kinder Morgan include "consequential" damages.

## II. IN THE ALTERNATIVE, THE DISTRICT COURT'S DECISION MAY BE AFFIRMED BASED ON KINDER MORGAN'S STATUS AS A HOLDOVER TENANT.

If this Court concludes that the District Court clearly erred in finding the parties had an implied in fact agreement to abide by the Lease, it can and should affirm the judgment because the record supports the conclusion that Kinder Morgan was a holdover tenant. *Ross*, 743 F.3d at 893.

A tenant that holds over after a lease expires with the landlord's consent automatically becomes a periodic "holdover tenant." Md. Code Ann. Real Prop. § 8-402(c) ("Unless stated otherwise in the written lease and initialed by the tenant, when a landlord consents to a holdover tenant remaining on the premises, the holdover tenant becomes a periodic week-to-week tenant if the tenant was a week-to-week tenant before the tenant's holding over, a periodic month-to-month tenant in all other cases."); *see also* § 1-101(k) (defining "property" as "real property or any interest therein or appurtenant thereto"); *Premier Auto. Servs., Inc. v. Flanagan* (*In re Premier Auto. Servs., Inc.*), 492 F.3d 274, 281 (4th Cir. 2007) (recognizing that

commercial tenant holding over after expiration of lease becomes a holdover tenant under Maryland law).

It is well-settled that a holdover tenant occupies the leased premises subject to the express terms and conditions of the expired lease. *Straley v. Osborne*, 278 A.2d 64, 68 (Md. 1971) ("the holdover tenancy is on all the terms and conditions of the original lease"); *Annapolis Fire & Marine Ins. Co. v. Rich*, 212 A.2d 249, 255-56 (Md. 1965) (the terms and conditions of the original expired lease carry over into the holdover tenancy); *Cramer v. Baugher*, 100 A. 507, 509 (Md. 1917) ("It seems so well established that it must be regarded as settled now that, where a tenant is allowed to remain in possession after the expiration of a term, with the consent of the landlord, the law presumes the holding to be on the terms of the original demise and subject to the same rent and to all the covenants of the original lease.").

RG Steel established at trial that Kinder Morgan was subject to the Lease as a holdover tenant because it continued to occupy the Leased Premises at Sparrows Point and to operate and maintain the land, facilities, and the bridge crane after the Lease expired and until the crane was destroyed. Op. 17, 20; Trial Tr. 88:5-23, Nov. 19, 2013;

Trial Tr. 94:3-96:12, Nov. 20, 2013; Betz Dep. 43:11-13, 45:14-48:16; 53:18-56:16; 59:11-22; 106:24-108:12; Russo Dep. 95:20-96:2, June 8, 2010; Brady Dep. 198:13-199:6, 200:18-22, Apr. 22, 2010; PTX 40 at KM 56945. Kinder Morgan also continued to pay rent on its buildings, pay Sparrows Point for rent on buildings, electricity, and wharfage fees, all at rates set forth in the Lease. Op. 20; Trial Tr. 45:22-46:4, Nov. 12, 2013; Trial Tr. 89:5-90:1, Nov. 20, 2013; Betz Dep. 108:13-21, 109:15-111:9, 139:2-140:13; Brady Dep. 202:4-25, 203:8-204:13; Russo Dep. 97:3-21; Von Restorff Dep. 25:23-26:20, May 6, 2010; 32:22-34:2, 89:4-90:7; PTX 40 at KM 56945; PTX 50; PTX 52.

The District Court agreed that, "to the extent the Lease governed the parties' relationships with respect to the real property at Sparrows Point," it "seems fairly clear" that Kinder Morgan was a holdover tenant. The Court decided it need not reach the issue, however, in light of its decision that the parties had an implied in fact agreement to abide by the Lease. Op. 17-18, n.9.

Kinder Morgan does not mention the holdover issue on appeal, but it does not dispute that it continuously occupied the Lease Premises with Sparrows Point's consent until the mill closed in 2013. Nor does it

dispute that it continued to pay rent and utilities and maintain and operate the bridge crane after the Lease and its extensions expired. Kinder Morgan thus cannot dispute that it was a holdover tenant "subject to all the covenants in the [L]ease," *Gostin v. Needle*, 45 A.2d 772, 773 (Md. 1946), including the assumption of risk clause and indemnity provisions.

Kinder Morgan disputed this conclusion below based on its argument that the holdover relationship, if any, extended only to the Leased Premises, and not to the bridge crane, which it characterized as personal, not real, property. Op. 17, 18 n.9 (citing ECF No. 164-1 at 5 (citing *Consol. Gas, Elec. Light & Power Co. v. Ryan*, 169 A. 794,795 (Md. 1934) for the proposition that a crane is not a fixture to real property).

But the character of the bridge crane is irrelevant to the holdover issue. The law is clear that a holdover tenant is one who stays on after a lease has expired with the permission of the landlord, Md. Code Ann. Real Prop. § 8-402(c), just as Kinder Morgan did here. Such a party is subject to "all the terms and conditions of the original lease," including terms that go beyond actual occupancy of the property. *Straley*, 278

A.2d at 68. As discussed above, the Lease permitted Kinder Morgan to use the bridge crane, established its compensation for use of the crane to unload Sparrows Point's cargo, and required Kinder Morgan to assume all risk and indemnify Sparrows Point if the bridge crane were destroyed or damaged.

The case cited below by Kinder Morgan has nothing to do with the obligations of a holdover tenant and does not support Kinder Morgan's arguments. *Consolidated Gas* involved a mortgagor's right to include in a foreclosure sale a crane that was expressly listed as security for the loan. 169 A. at 795-96. Recent cases regarding the definition of "fixtures" hold that the intent of the owner is the key to the analysis. *E.g., Colonial Pipeline Co. v. State Dep't of Assessments & Taxation*, 806 A.2d 648, 661 (Md. 2002) (issue turned on "whether Colonial intended the pipeline to be a permanent annexation to the land intended to benefit that land."). Under this test, the bridge crane is unquestionably a fixture, because the parties stipulated that Bethlehem Steel constructed it "specifically for its location at Sparrows Point," Stip. Facts ¶ 10, and the Lease itself specifies that the bridge crane could not be moved or removed, PTX 15, § 12.01(e).

In sum, if it reaches the issue, this Court should rule as a matter of law that Kinder Morgan was a holdover tenant subject to the terms of the Lease, including the damages and indemnity provisions relating to the loss of the bridge crane.

## III. SUBSTANTIAL EVIDENCE SUPPORTS THE DISTRICT COURT'S AWARD OF DAMAGES FOR DEMURRAGE AND CHANGES IN COMMERCIAL TERMS.

The District Court awarded damages for demurrage and changes in commercial terms resulting from the destruction of the bridge crane, as well as other general damages, based on its careful review of the testimony and the documentary record. It did not award the entire amount that RG Steel requested, however, and it denied certain categories of damages altogether.

Kinder Morgan argues on appeal that the Court's awards for demurrage and changed commercial terms are not supported by substantial evidence, a test it improperly tries to pass off as *de novo*. KM Br. 50 ("Whether or not evidence is sufficient to support a claim for a category of damages presents a question of law that this Court reviews de novo," citing *Ross*, 743 F.3d at 894). *Ross* says no such thing. To the contrary, it states that a district court's factual findings

are reviewed for clear error and are entitled to "even greater deference" when they turn "on assessments of witness credibility or the weighing of conflicting evidence during a bench trial." *Id.*

The District Court's awards for demurrage and changed commercial terms are amply supported by the record, including but not limited to the testimony of RG Steel's economist, Jeffrey Cohen and Sparrows Point's longtime controller, Jeffrey Gennuso, who worked for several of the mill's consecutive owners, starting in 2004.   Trial Tr. 3:17-21, Nov. 13, 2013.

## A.    The District Court Properly Exercised Its Discretion in Hearing the Testimony of RG Steel's Economics Expert.

Kinder Morgan starts by arguing that the District Court abused its discretion in allowing the testimony of RG Steel's economics expert, Jeffrey Cohen, because Cohen had no special knowledge of the shipping industry.  KM Br. 50-54.

But there is no special magic about demurrage, which is basically an agreed on fee levied for keeping a ship in port longer than originally contracted, or about modifying contractual terms to reflect operational changes resulting from the destruction of the crane.

43

The District Court thus properly exercised its discretion to consider Cohen's testimony as an economics expert. Trial Tr. 81:5-8, Nov. 14, 2013 (Court: "I don't know that the opinions that he's going to be asked to give would be outside of his basic knowledge as an economics expert."). *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) ("at bottom, the court's evaluation [of expert testimony] is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability." ); *see Northern Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 468 (1st Cir. 1988) ("a trial judge has wide discretion in the admission or exclusion of opinion evidence. This discretion, expansive in all events, is at maximum girth in the context of a bench trial.").

Kinder Morgan does not dispute the general method used to calculate damages, instead, it claims that Cohen did not consider all possible alternate causes that Kinder Morgan claimed, but did not prove, impacted the damage calculation. Failure to account for all possible alternative causes does not, as Kinder Morgan suggests, render an expert's testimony inadmissible or unreliable. *CSX Transp., Inc. v.*

44

*Miller*, 858 A.2d 1025, 1073-74 (Md. 2004) (citing *Westberry v. Gislaved*

*Gummi AB*, 178 F.3d 257 (4th Cir.1999)); *accord Mack v.*

*AmerisourceBergen Drug Corp.*, 671 F. Supp. 2d 706, 711 (D. Md. 2009)

("the admissibility of Dr. Marks' testimony is not affected by the

existence of alternative causes or any other claimed defects concerning

his differential diagnosis. Instead these matters implicate only the

weight of his testimony and they may be explored by Defendants

through cross-examination.") (citations omitted).

Notably, the Court did not accept Cohen's damages calculations

blindly or without reservation. To the contrary, it considered Cohen's

testimony in conjunction with the rest of the evidence, modified some

estimates (including for commercial changes), and rejected others. *E.g.*,

Op. 43.

Furthermore, the Court's awards were not based solely on Cohen's

testimony, as Kinder Morgan disingenuously asserts, *e.g.,* KM Br. 49-

50, but on contemporaneous business records submitted by RG Steel

and Kinder Morgan, including invoices reflecting the amounts RG Steel

paid for demurrage and the testimony of numerous percipient

witnesses, including Sparrows Point's controller, Gennuso. The District

Court did not abuse its discretion in admitting Cohen's testimony or awarding damages.

### B. Substantial Evidence Supports the District Court's Calculation of Damages Incurred for Demurrage and Commercial Changes.

#### 1. The amount of damages is a matter of "reasonable inference."

"Maryland law [] controls as to the burden of proof, the inferences to be drawn from the evidence, and the sufficiency of the evidence presented on a particular issue." *Kirby v. Chrysler Corp.,* 554 F. Supp. 743, 752 (D. Md. 1982) (citing *Joffre v. Canada Dry, Inc.*, 158 A.2d 631 (Md. 1960)).  Kinder Morgan argues that RG Steel failed to prove damages relating to demurrage and commercial charges to a "reasonable certainty."  KM Br. 56.  Kinder Morgan conflates causation with the amount of damages proven.  "In Maryland, … 'if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference.'" *Thomas v. Capital Med. Mgmt. Assoc., LLC*, 985 A.2d 51, 66 (Md. Ct. Spec. App. 2009) (rejecting a similar argument) (quoting *David Sloane, Inc. v. Stanley G. House & Assocs., Inc.*, 532 A.2d 694 (Md. 1987).  "'[M]ere difficulty in ascertaining the amount of damage is not fatal,' and 'mathematical precision in fixing

46

the exact amount is not required.'" *Id.*; *see also Red Jacket Oil & Gas Co. v. United Fuel Gas Co.*, 146 F.2d 645, 650 (4th Cir. 1944) ("'Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, though the result be only approximate.'") (quoting *Eastman Kodak Co. of New York v. Southern Photo Materials Co.,* 273 U.S. 359, 379 (1927).

Kinder Morgan does not dispute that RG Steel suffered damages related to demurrage and commercial changes; it disputes rather the *amount* of damages computed by RG Steel's witnesses. KM Br. 58 (arguing that Cohen failed to account for "factors that could have affected his demurrage computation"); KM Br. 67 (same regarding commercial terms). Under the foregoing authorities, these amounts need not be computed to a reasonable certainty (as in fact they were here), but only to a reasonable inference.

The cases cited by Kinder Morgan for the proposition that a party "fails to establish damages to a reasonable certainty where it relies on expert testimony that fails to account for other factors that might have contributed to the damages," KM Br. 57, do not so hold. In C*ooper v.*

47

*Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001), and *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 251(4th Cir. 1999) (cited in KM Br. 57-58), this Court simply held that the trial court had not abused its discretion in rejecting expert testimony; it did not rule that the district court was required to do so under the federal laws at issue, or say anything about Maryland's reasonable certainty standard. In *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 276-77(4th Cir. 1995) (also applying federal law), this Court affirmed the district court's decision to reject expert evidence in a summary judgment case, where the evidence in question did not raise even a "scintilla" of evidence to support the plaintiff's position. All three cases are thus entirely inapposite.

### 2. The District Court properly awarded RG Steel $2,734,182 in demurrage damages.

It is undisputed that, after the destruction of the bridge crane, it was no longer possible to unload coke at the "A" Pier with the bridge crane. Op. 32; Trial Tr. 25:18-25, Nov. 13, 2013 (Gennuso). As a result, all incoming vessels to Sparrows Point, including coke vessels, were initially unloaded at the New Ore Pier, a different location from the "A" Pier and Yard where coke was stored and staged for use in the blast furnace. Op. 32. Congestion at the New Ore Pier meant that vessels

48

were delayed getting in and out, which led ship-owners to charge
"demurrage." *Id*. 32-33; Trial Tr. 33:12-14, 34:1-4, Nov. 13, 2013
(Gennuso: "when you contract a ship, you are essentially renting [it] for
a number of days. [¶] When you exceed those days, you get a penalty
… called demurrage."); Trial Tr. 85:4-9, Nov. 14, 2013 (Cohen). The
ship owners billed RG Steel for demurrage and RG Steel paid the bills.
Trial Tr. 34:5-36:21, Nov. 13, 2013 (Gennuso); PTX 151. Such
demurrage was caused by the inability to unload vessels at the
scheduled times and at the discharge rate that were used when the
bridge crane was available unload.

Gennuso explained that, even before the accident, delays at the
New Ore Pier resulted in payment of some demurrage, so RG Steel did
not seek all of the demurrage incurred in the two months after the
accident, but only "incremental demurrage." Trial Tr. 35:14-36:8, Nov.
13, 2013 (Gennuso). Cohen took this into account by reviewing the
demurrage fees incurred in the months before the accident and
calculating an incremental per ton demurrage rate, which he used to
calculate the demurrage due to loss of the bridge crane. Op. 33; Trial
Tr. 85:10-89:10, Nov. 14, 2013 (Cohen).

49

Kinder Morgan argued that only two vessels were scheduled to go to the "A" Pier during that month, so it should only be held liable for penalties paid on those two ships.  Op. 32-33.  Gennuso explained, however, that the mill had to unload the two coke vessels first to keep the blast furnace stoked for steel-making operations.  The failure to do so would have had catastrophic results for the mill. Trial Tr. 25:21-25, 42:8-17, 43:5-44:5, Nov. 13, 2013 (Gennuso).  Without coke, the furnace would cool, putting an end to steelmaking operations and causing the mill to incur enormous additional damages. *Id.*  RG Steel thus had to rearrange the schedules for all ships at New Ore Pier, and, as a result, demurrage penalties were "spread over a larger number of vessels." Trial Tr. 21:18-23:3, Dec. 2, 2013 (Gennuso).  Gennuso explained, "[w]e looked at which ships were going to incur the highest rates of demurrage, which ones were the oldest ones and which were needed … to prevent shutdown or material shortages.  And that's how we decided how to schedule those at the port." Trial Tr. 22:20-25, Dec. 2, 2013 (Gennuso).

The District Court found this explanation credible.  Op. 33-34.  It dismissed "Kinder Morgan's suggestion that it is responsible only for

the demurrage incurred by [the two] coke ships when it cannot seriously be disputed that the offloading of other ships was impacted in some way by the congestion and movement of coke ships to [New Ore Pier]," and rejected Kinder Morgan's proposed damages figure because it was "not supported by the weight of the evidence set forth at trial." *Id*. 34. It accepted Cohen's damages calculation in keeping with the evidence presented at trial. *Id*.

> ### 3. The District Court properly awarded RG Steel $1,064,507 for damages attributable to commercial changes.

To mitigate damages, Sparrows Point looked for ways to avoid demurrage, which is "greater than the cost per day that you initially contract." Trial Tr. 33:15-16, Nov. 13, 2013 (Gennuso). One way it did this was by adjusting the terms of its contracts with suppliers shortly after the accident to reflect the longer amount of time it took to unload or "discharge" coke. In other words, Sparrows Point bargained at the outset to pay more in view of the extra time the ships would need to remain in port – a cheaper solution than paying demurrage. Op. 40-42; Trial Tr. 36:23-37:4, Nov. 13, 2013 (Gennuso: "to mitigate these costs from a demurrage perspective, . . . we hired vessels at a slower

51

unloading rate, which was cheaper than paying the penalty to delay the unloading[.]"); Trial Tr. 102:15-22, Nov. 14, 2013 (Cohen: to avoid the higher cost of demurrage, "the company … restructure[d] its commercial terms shortly after the crane collapse to recognize the fact that it would be unable to unload at its previous rate").

Based on unloading figures provided by Kinder Morgan, RG Steel changed terms to account for the difference between the old rate – 8,000 tons a day – to the new rate – 5,000 tons a day. Trial Tr. 102:8-104:3, Nov. 14, 2013 (Cohen); Trial Tr. 23:18-24:22, Dec. 2, 2013 (Gennuso); DTX 47 at SSP 86009; PTX 42 at SSP42139; PTX 156B at 1. As a result, Cohen and Gennuso testified, the mill paid more for coke than it would have paid had it been able to unload as efficiently as it did before the accident. Trial Tr. 102:8-104:3, 143:19-145:14, Nov. 14, 2013 (Cohen); Trial Tr. 23:18-24:22, Dec. 2, 2013 (Gennuso).

Kinder Morgan complained that Cohen put too much weight on two particular contracts and failed to account for other alleged variables that its counsel speculated could have been responsible for the higher prices RG Steel agreed to pay for coke. Op. 41. But, as the District Court observed, "Kinder Morgan offered no evidence" to support its

52

counsel's argument. *Id.* 41-42. Invoices showing a smaller margin of difference before and after the accident were by themselves insufficient to rebut Cohen's testimony, in the absence of evidence that other factors – such as the price of coke, credit worthiness or market conditions – remained constant. *Id.*

Cohen explained that he did not rely solely on the two contracts. He also relied on data from RG Steel regarding the number of tons of coke unloaded at Sparrows Point, conversations with steel mill personnel regarding the discharge rates of coke ships, and publicly available sources detailing the daily discharge rates for ships. Trial Tr. 103:2-22, 164:24-165:21, Nov. 14, 2013 (Cohen).

The District Court awarded about two-thirds of the damages RG Steel requested, based on its determination that Cohen did not sufficiently account for improvements in rate of discharge after the addition of new equipment in 2011. Op. 42-44 (awarding RG Steel $1,064,507 of the $1,526,104 it requested).

### 4. The District Court properly applied the burden of proof.

Kinder Morgan argues at length that the District Court erred by "shifting the burden on [sic] Kinder Morgan to rule out alternative

causes" with respect to the amount of damages RG Steel incurred for demurrage and commercial changes.  KM Br. 66, *see generally* KM Br. 55-68.  Kinder Morgan misconstrues the law and the District Court's legal analysis.

RG Steel does not dispute that it had the burden of proving the amount of damages.  The District Court found that it met that burden, and substantial evidence supports the amount of damages the Court awarded for demurrage and commercial changes.  Kinder Morgan's counsel asked Cohen whether he had considered various factors (most of which he had), Trial Tr. 137-143, Nov. 14, 2013, but Kinder Morgan offered no evidence of its own to support the inference that any of these other factors would have affected Cohen's damages calculation.

The District Court did not shift any burden to Kinder Morgan.  To the contrary, it found that Kinder Morgan did not proffer any evidence with respect to the factors it alleged might have been responsible for increased costs.  *See Kruvant v. Dickerman*, 305 A.2d 227, 231 (Md. Ct. Spec. App. 1973) ("when a plaintiff has established a prima facie case by proving his damage, according to one acceptable measure of damage, it becomes the obligation of the defendant to offer evidence that the

54

damage would be less under a different acceptable measure of damage."); *F.D.I.C. v. Bakkebo*, 506 F.3d 286, 298 (4th Cir. 2007) (district court did not err in concluding that the jury's award of damages was warranted by the evidence, where appellant "conspicuously, offered no evidence to the contrary").

Moreover, even if Kinder Morgan *had* put on evidence, the District Court would have had discretion to reject it. *E.g., Moseman v. Cnty. Council of Prince George's Cnty.*, 636 A.2d 499, 503 (Md. 1994) ("Even if this Court were to have concluded differently than the District [Court] from the same testimony, we would not engage in relitigating a battle of the experts. The issue is whether there is competent, probative, and substantial evidence from which the District [Court] could have reasonably reached its conclusions.").

To prevail on appeal, Kinder Morgan would have to show that there was no substantial evidence to support the District Court's conclusions. *Kowell Ford, Inc. v. Doolan*, 391 A.2d 840, 841-42 (Md. 1978) ("if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed."). It did not and it cannot. As set forth in the District Court's opinion and

discussed above, there was ample evidence – even without Cohen's testimony – to support the damages awards adopted by the Court. This Court should therefore affirm the awards for demurrage and commercial changes.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's judgment in full.

Respectfully submitted,

Dated:  August 4, 2014          **BARNES & THORNBURG LLP**

By   /s/   Denise A. Lazar
    Denise A. Lazar
    BARNES & THORNBURG LLP
    One North Wacker Drive
    Chicago, IL 60606

    Attorney for Plaintiff/Appellee
    RG Steel Sparrows Point, LLC

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. 32(a)(7)(B) because:

   this brief contains <u>10,954</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2010, Century Schoolbook, 14 point font</u>.

August 4, 2014

   <u>/s/ Denise A. Lazar</u>

Attorney for Plaintiff/Appellee
RG Steel Sparrows Point, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2014, I electronically filed the foregoing **RESPONSE BRIEF OF APPELLEE** with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Joseph Michael Rainsbury
LECLAIR RYAN, PC
Drawer 1200
1800 Wells Fargo Tower
10 South Jefferson Street
Roanoke, VA 24011
joseph.rainsbury@leclairryan.com

Thomas M. Wolf, Esq., Senior Litigation Counsel
LECLAIR RYAN, PC
8th Floor
951 East Byrd Street
Richmond, VA 23218-0000
thomas.wolf@leclairryan.com


  /s/   Denise A. Lazar
Attorney for Plaintiff/Appellee
RG Steel Sparrows Point, LLC